Russell *v.* Livingston.

[MONROE GENERAL TERM, March 5, 1855. *Johnson, Welles* and *T. R. Strong,* Justices.]

---

## RUSSELL & ANNIS *vs.* LIVINGSTON & WELLS:

Persons whose business is, and is represented by them to the public to be, to receive, convey and deliver money, bank bills and goods, of those who choose to employ them, for a compensation, are common carriers, and responsible as such for the safe delivery of property intrusted to them.

The cashier of the Bank of Amsterdam delivered to the defendants, at that place, a package of bank-notes belonging to the plaintiffs and directed to them at "Port Gibson, care of Dawley, express agent, Vienna." The defendants were an express company, doing business on the line of the Central Rail Road, from New York to Buffalo. They had an office at Vienna, and Dawley was their agent there; but they had no agent at Port Gibson and were not in the habit of sending money packages to that place. They charged freight on the package in question only from Amsterdam to Vienna. The package was received by Dawley at Vienna, and his clerk delivered the same to the driver of a stage running from Vienna to Port Gibson, to be carried to the plaintiffs at the latter place, but the package was lost by the driver, and never delivered.

*Held,* 1. That the fair construction of the direction upon the package was that the package should, on its arrival at Vienna, be committed to the care of Dawley, not as express agent, but as an agent of the plaintiffs, to receive, and forward, the package to them.

2. That having carried the package to Vienna and delivered it to Dawley, the duty of the defendants was performed, and their liability at an end; and that they were not responsible for the subsequent loss of the package between Vienna and Port Gibson.

3. That the fact that the charges were unpaid, and that the defendants therefore had a right to detain the package until they were paid, did not alter the case; inasmuch as they had the right to waive the lien, and it was evident that they did so, on delivering the package to Dawley.

Russell *v.* Livingston.

THIS action was brought against the defendants as common carriers, to recover the value of a package of bank bills delivered to the defendants at Amsterdam, Montgomery county, for the plaintiffs, to be carried to East Vienna in the county of Ontario. The cause was tried at the Ontario circuit in November, 1853, before Mr. Justice T. R. STRONG. A jury was waived by the parties, and the cause tried by the court, who rendered a judgment for the plaintiffs. A bill of exceptions was taken, which contained the following facts and evidence. On the 19th November, 1849, the plaintiffs, who resided at Port Gibson, in the county of Ontario, wrote to the cashier of the Bank of Amsterdam as follows:

"*Port Gibson, November* 19, 1849.

Marquis Barnes:

Dear Sir, We sold Messrs. C. M. Hart & Co. a boat load of wheat, and received of him in part payment your certificates for $981, which you will please to remit us by Wells & Co's express, to the care of Mr. Dawley, express agent, East Vienna. Please mark the package Russell & Annis, Port Gibson, care of Dawley, Vienna, and very much oblige

Your ob't Ser'vts, RUSSELL & ANNIS."

Upon the receipt of this letter the cashier of the bank enclosed to the plaintiffs in a package sealed up, $981 in bank bills, directed, as the clerk of the bank testified, as follows:

" Russell & Annis, Port Gibson.

Care of Dawley, Express agent, Vienna—$981." The clerk also testified that the money belonged to Russell & Annis; that the messenger took it from the witness' hand; the car which he was in had Wells & Co's express mark upon it; it was an ordinary rail road car; the person in the car who took the package was one of Wells & Co's. agents; that he had often delivered money packages to the agents in that and other cars similarly marked before, and had also received such packages for the bank from such persons. That he had before given money packages to this same person, to be carried to different parts of the state. The witness also testified that the car he spoke of, was one of a train on the Utica and Schenectady Rail Road. The direction on the package was put on it in pur-

suance of the order of the plaintiffs, and the witness stated that he had kept a copy of the direction on the package.

George W. Bemis, a witness for the plaintiffs testified, that he resides in Canandaigua; was agent in that place for Wells and Co., in 1849, and had been since March, 1848. That the defendants' business was carried on along the line of the central rail road, from New York to Buffalo; that they used the rail road in doing their business; they sent packages which were delivered to them; these packages were carried in the rail road cars. The packages were usually put in a car, a portion of which was occupied by the mail agent; the car was divided into three subdivisions, one was occupied by the express messenger, who had charge of valuable and money packages, the other end for storage of rough freight, and the post office was in the centre of the car; packages were received by the agent of the express, (by me for instance) to be forwarded to the place of destination; these were delivered to the messenger on the cars who was to be fonnd in the end of the car allotted to him. Witness was in the habit of receiving the packages at the car, and taking them to his office. " If the place of destination was on a side route, I kept them till they were called for; if directed to persons in the village, I delivered them personally; my office was in this village, (Canandaigua ;) I had an iron safe to keep them in, which was the joint property of myself and the express company. I was acquainted with Mr. Dawley, at Vienna; J. H. Dawley was his name. He was in the defendants' employ as agent of the company at the time; the defendants had agents and kept an office in Rochester and Geneva, and in the other cities and principal villages throughout the state on the line of the rail roads connecting Albany and Buffalo, solely kept for express business, and similarly conducted, as I have said. The defendants received and sent money packages at times; sometimes the packages were sealed in the office; when they came from the banks, they were generally sealed up. Defendants' business was to receive other goods, sometimes heavy parcels. I received and sent from here large sums of money, monthly; I think from fifty to one hundred thousand

dollars worth ."    That the rail roads on which the business was done were the Utica and Schenectady, the Utica and Syracuse, the Auburn and Syracuse, and the Auburn and Rochester rail roads, between Schenectady and Rochester.    It was admitted that these rail roads belonged to incorporated companies bearing the above names.

This witness further testified that the cars on which these packages were carried belonged to the respective rail road companies.    "The defendants paid ·the different companies for carrying freight and packages or property so transmitted.    In making out charges for freight, we graduated it so as to charge rate enough to pay the rail road companies, and to pay us for the trouble of doing the business ; my instructions from the defendants were to agree to receive and forward packages ; we had printed receipts which we filled up and gave for packages received to be forwarded ; I received them from the defendants' chief office in New York.    I was not authorized to give any other receipt than the printed ones ; sometimes banks gave us packages ; then I wrote the receipt in a book ; for example :   "Received of Bank of Ontario, a package marked to contain —— directed to —— to be forwarded by express."

。 Date and signature.

It has been our general practice to give such receipts for all packages coming from banks, whether for banks or individuals ; the receipts to a bank were all of the same kind, without reference to whom they were directed to.    We kept packages destined for places off the line, till called for, or on written order from the consignee ; that was the practice of this agency ; I do not·know whether or not it was the practice of all agencies ; there were no places to which stages ran from Canandaigua ; there was a time, before the direct rail road was built, when money packages were sent from Canandaigua to banks and individuals ; we sent them there generally by the stage, on a written order.    I do not know whether or not I received instructions to keep the packages till sent for ; I think it was the only safe way of doing it."

William Wilbur, a witness for the plaintiff, testified that in

1849 he lived in the town of Phelps, Ontario county, and drove a stage from Vienna to Palmyra, and from Vienna to Newark, for Ingersoll & Finlay, the proprietors of the stage line; had heard of Russell & Annis there, and knew Mr. Dawley; he was express agent at Vienna then; had an office and a sign; had an assistant named Jesse Peck; recollects receiving a package in 1849, from Mr. Peck, done up in length like bills; it was marked Russell & Annis, Port Gibson; it was marked to contain $981. "It was given to me at Vienna express office, between 3 and 4 o'clock in the morning of November 22d, I believe; I do not know what became of the package; I did not deliver it to Russell & Annis; I carried it to Palmyra; I lost it; I do not know where; I got to Port Gibson a little before daylight; Mr. Peck told me it would be rather early in the morning when I arrived at Port Gibson, and to take it to Palmyra and leave it at Port Gibson on my return. I came back that afternoon; I had no order from plaintiffs to get the package."

This witness testified on his cross-examination that he had before carried money packages for other people, but not for Russell & Annis; that the defendants never had any messenger or agent to go with him on the stage in charge of the packages; that this was the second summer he had driven there. "Ingersoll & Finlay lived at Vienna. I received pay for the packages of money that I carried from time to time, and paid it to Ingersoll & Finlay; Newark and Palmyra are not on the same route; the other driver and I changed routes every other day; I carried other packages besides money packages from the express, and collected money for carrying them, and paid to Ingersoll & Finlay; these packages I was in the habit of receiving from the express agent. Mr. Peck gave me a bill for the charges on this package, I think; I know he told me to collect the charge on it; the charge was on the express bill that came with the package; but did not include Ingersoll & Finlay's charge."

Edwin E. Ingersoll, a witness for the plaintiff, testified that in 1849 he was one of the proprietors of the stage line between Vienna and Palmyra; it left about $2\frac{1}{2}$ or 3 in the morning and

returned in the afternoon. "I did not authorize our drivers to receive and carry money packages from all persons desirous of sending money; I had special arrangements with the bank at Palmyra to carry their packages; that was all I ever gave orders for, or authorized or knew of their carrying; I told Mr. Peck that I did not want him to send money to Port Gibson by the drivers, on account of their getting there before daylight; I spoke to Peck in the fore part of that year; I got up that morning before the stage left; the driver came out of the office with a package; I asked him what he had; he said money; I took it away and gave it to Mr. Peck, and told him I would not allow my drivers to carry packages to Port Gibson; Peck said it was directed to a man at Port Gibson who wanted it very much; I told him I could not help it; I would not allow the drivers to carry money packages to Port Gibson; it is eight or nine miles from Vienna to Port Gibson. Our firm received pay for money packages carried by our drivers."

James H. Dawley, a witness for the defendants, testified that he was the defendants' express agent at Vienna in 1849. "I received the package spoken of from the express messenger on the cars; it was marked,

'Messrs. Russell & Annis,<br>Port Gibson.

Care of J. H. Dawley, Vienna.             $981.'

I should say it did not have 'express agent' on it. The day after the package was lost, I made a memorandum of the manner of the direction, and of its loss; I did not put 'express agent' down; I am quite sure it was marked to my care, Vienna; I was in the habit of sending by the stage line of Ingersoll & Finlay, money packages received by express for Palmyra; we sent a considerable number for Palmyra, but I do not recollect any other for Port Gibson than the one which was lost; Port Gibson is between Vienna and Palmyra, in the direct stage line; I never received any information from any one that Ingersoll & Finlay did not want money packages delivered to their drivers for Port Gibson; I never had any such instructions from them; heard Bemis testify, and agree with him as

to the defendants' mode of doing their business.   Most of our express packages were for Newark and Palmyra; express packages formed quite an important part of the stage company's business; I considered Ingersoll & Finlay a responsible firm at the time; packages of various kinds were brought by their stage drivers (including money packages) to Vienna, destined to various places, to be sent by express; packages would sometimes come to Vienna from Palmyra to go east, (for instance,) and I would pay the stage charges on them; sometimes pay the drivers and sometimes the proprietors, and then add what I paid on my express bill; and as to charges on packages that came from the east for Port Gibson and Palmyra and Newark, I charged only to Vienna; sometimes I collected from the stage at the time, and sometimes I sent a bill with the driver to collect; the instructions to me were to collect the express charges whenever I delivered up the packages.   Mr. Peck was my clerk in the express office; I left for Rochester on the same train that brought me this package; I received it, took it in my office, and put the package in a bag and handed it to Mr. Peck; I had a safe in the office that belonged to Wells & Co. to put packages in; my course was to put it in the safe."

Considerable other evidence was given, not deemed material to the understanding of the points decided.   It was mutually admitted that the plaintiffs and defendants were respectively partners in business.   The justice, on rendering judgment for the plaintiffs at the circuit, delivered the following opinion:

" The defendants must be held to be common carriers; their business is, and is represented by them to the public to be, to receive, convey and deliver money, bank bills and goods of such as choose to employ them, for a compensation; and this brings them within the well-settled definition of common carriers. That they are not the owners of the conveyances they employ in the conduct of their business, does not affect the legal character of their business.   They are none the less common carriers because they make use of the public conveyances of others. (*Moore* v. *Evans*, 14 *Barb.* 524.   *Teall* v. *Sears*, 9 *id.* 317.)

Russell *v.* Livingston.

It is a full answer to the position of their counsel, that the defendants are mere express forwarders or forwarding merchants, that they, acting by their messengers, retain the custody of the money, bank bills and goods intrusted to them during their passage and until delivery. A forwarding merchant delivers the property he receives to the carrier, and the carrier has the custody of it for the purpose of its carriage. (*Parsons on Cont.* 650 *to* 657, *and notes.*)

The defendants being common carriers, and having received the package in question without any special agreement, they were responsible as such for its safe delivery according to their legal obligations. The package was directed to the plaintiffs at Port Gibson, a point off the line of the defendants' route of transportation, to the care of Dawley, express agent, Vienna, this latter place being the point on the defendants' route nearest to Port Gibson. Under this direction, I think the obligation imposed by law upon the defendants in reference to the delivery, was to deliver the package to Dawley, if he would pay the charges and receive it. The words, "To the care of Dawley, express agent," were inserted for some purpose; and the fair construction of them, in my opinion was, that the package should, on its receipt at Vienna, be committed to Dawley's care, not as "express agent,"—these words being merely descriptive of the person—but as an agent for the plaintiffs to receive and hold and forward the package. If it had been intended that the package should remain with the defendants, in the hands of their agents, the words, "to the care of Dawley, express agent," would not have been necessary; and it may properly be assumed that this was known to the plaintiffs when they gave instructions as to the directions to be placed on the package ; and that their intention was, that Dawley would take care of it in like manner that any other person would if named for that purpose instead of him.

The question remains : did the defendants discharge their obligation in reference to the delivery ? It appears that the package arrived at Vienna in the evening, and was received by Dawley from the messenger on the cars, and placed in the ex-

press bag, and the bag was then handed by Dawley to a clerk in the express office, with directions to send the package to the plaintiffs by the driver, in the morning, and that the clerk handed it to the driver according to the directions. The charges of the defendants were not paid; no act was done by the defendants, by their own agents, indicating an intention to commit the charge of the package to Dawley as an agent of the plaintiffs; nothing which put the package beyond their power to retain it for the charges. Indeed the direction to the care of Dawley does not appear to have been at all regarded. The agent of the defendants, as is to be inferred from his conduct, believed it his duty as such agent to forward the package to the plaintiffs, in the mode adopted by him, and in forwarding the package, assumed to act as agent of the defendants and not of the plaintiffs. If the defendants might properly have forwarded the package to the plaintiffs by the driver, in the absence of any special instructions from the plaintiffs or the stage proprietors, I am satisfied it was a breach of duty to deliver it to the driver, after the instructions of Ingersoll, one of the stage proprietors, to the clerk in the office of Dawley, express agent, not to send money packages to Port Gibson by the drivers, which instructions do not appear to have been at any time revoked. It follows, from these views, that the defendants are liable for the loss of the package, and I think they are liable to interest on the sum lost from the time of the loss."

Judgment was accordingly ordered for the plaintiffs for $981 and interest.

From this judgment the defendants appealed to the general term.

*Cambridge Livingston*, for the appellants.

*H. O. Chesebro*, for the respondents.

*By the Court*, WELLES, J. I agree with my learned brother before whom this action was tried, wherein he holds that the business of the defendants, in the course of which, by their

agent, they received the package of money in question, was that of common carriers; and that being such common carriers, they were responsible as such for its safe delivery according to the legal obligations attaching to persons standing in that character. I also agree with him that the fair construction of the words in the direction on the package, "*care of Mr. Dawley, express agent,*" was, that the package should, on its arrival at Vienna, be committed to the care of Dawley, not *as* express agent, but as an agent of the plaintiffs to receive and hold and forward the package, to the plaintiffs. That if it had been intended that the package should remain with the defendants in the hands of their agents, the words "care of Dawley, express agent," would not have been necessary; that it may properly be assumed that this was known to the plaintiffs when they gave instructions as to the directions to be placed on the package; and that their intention was that Dawley should take care of it in like manner that any other person would, if named for that purpose, instead of him. But these and other considerations have irresistibly impelled me to a conclusion adverse to the plaintiffs' right to recover.

When the package was received by Dawley, as the agent of the plaintiffs, and designated by them as such, the duties of the defendants as common carriers had ended. Occupying the double capacity of agent of the plaintiffs for receiving the package, and as general local agent of the defendants, at Vienna, in relation to their business as common carriers, Dawley might, in the latter character, have refused to part with it until the defendants' charges were paid. As agent for the defendants, he was neither required nor authorized to commit it to the hands of any one but the plaintiffs or their authorized agent. Whatever he did, therefore, in that direction, was necessarily as agent for the plaintiffs. It should be borne in mind, that the defendants' business as common carriers was confined to carrying between cities and villages on the rail road. Port Gibson was not on the rail road, and not a place included in any of their routes, and was not the place to which they undertook to carry the package in question. The duty of the defendants was to

carry it to Vienna and deliver it to Dawley, and having done that, as before remarked, their duty was performed and their liability at an end.   This view derives strength from the fact that the defendants charged freight on the package only from Amsterdam, where they received it, to Vienna, where they were to deliver it.

It seems to me that the fact that the charges were unpaid, and that the defendants therefore had a right to detain the package until they were paid, proves nothing against them. They clearly had the right to waive the lien, which I think it is evident they did.   Dawley, as the defendants' agent, consented that the same Dawley as the plaintiffs' agent should forward the package to the plaintiffs, with the account for the charges to be collected.   How, it may be asked, could the charges be actually paid and the lien thereby practically removed? Clearly in no way except by Dawley paying himself.

In my opinion the judgment should be reversed and a new trial granted, with costs to abide the event.

Ordered accordingly.