Sherman v. Wells.

SHERMAN *vs.* WELLS, president of the American Express Company

Persons whose business it is to receive packages consisting of coin, bullion, bank notes, commercial paper, and such other articles of value as parties think fit to intrust to their care, for the purpose of transporting the same from one place to another, for a compensation, are *common carriers,* and responsible as such for the safe delivery of property intrusted to them.

And they will be held to the stringent rule of law which makes a carrier an insurer against all except the act of God and the public enemy.

Where goods are intrusted to a carrier and not delivered according to contract, the value of the goods, with interest thereon from the day when they should have been delivered, is the measure of damages.

APPEAL from a judgment entered upon the report of a referee. The action was brought for the purpose of charging the defendant, as a common carrier, for the value of certain bonds of the state of Michigan, intrusted to him at Buffalo, for transmission to the plaintiff at Detroit, and which he failed to deliver. The defendant put in an answer denying that he was a common carrier, or liable as such, and alleging that he was the president of the American Express Company, an association transacting a general express agency, for hire, but not doing business as common carriers. The answer also put in issue the other material allegations of the complaint.

The cause was referred to a referee, (Hon. E. P. Cowles,) who made his report, by which he found the following facts: *First.* The defendant was the president of a company generally called the American Express Company. The principal office of such company was kept in the city of Buffalo. It was an unincorporated company, had branch offices, and agents in charge of such branch offices, in most of the principal cities to the west of Buffalo, and was largely engaged during the year 1852 in the business hereinafter more particularly described. The firm name of such company was Livingston, Fargo & Co. *Second.* Said express company received at its office in Buffalo, packages consisting of coin, bullion, bank notes, commercial paper, and such other articles of value as parties thought fit to intrust to the care of such company, for the purpose of being transported to other points west of Buffalo; and for its services in respect of its undertaking concerning such packages, said company charged and received a price per package proportionate to the intrinsic value of such package in part, and regulated also in part by its size and weight, and upon receiving it took upon itself the duties hereinafter more particularly described. *Third.* Upon the receipt of such packages at its office in Buffalo, the said company uniformly gave receipts. That the general form of receipt was known generally to the public, and to the Patchin Bank, as the form of receipt given, except in exceptional cases, and hereinafter more particularly described. *Fourth.* The instances in which receipts in a special form were given by the said express company, were as follows: Certain of the banks in Buffalo, among which was the Patchin Bank, and certain private bankers and brokers in said city who were in the habit of intrusting packages to said express company, provided themselves with a receipt book, which book was kept by such several parties, and upon which blank receipt books the express company upon the receipt of packages from such parties, respectively gave receipts for such packages, and such receipts were of the character and in the terms substantially, *mutatis mutandis,* of the particular receipt

hereafter set forth as given to the Patchin Bank. *Fifth.* On the 19th day of August, 1852, the Patchin Bank delivered to the said express company in the city of Buffalo, a package containing six several bonds issued by the state of Michigan, four of which were conditioned for the payment of the sum of $1000 each, one of which was conditioned for the payment of the sum of $500, and one of which was conditioned for the payment of the sum of $100, all bearing interest at the rate of six per cent per annum, and all of them belonging to the plaintiff in this action; such bonds were enclosed in an envelop directed to J. C. W. Seymour at Detroit, Michigan. The company, upon receiving the package from the Patchin Bank, made an entry on its own books as follows : " 1 Pa. 4600, Pat. Bk., J. C. W. Seymour, Dct. 3, 75," the meaning of which is as follows : "Received one package of $4600 from the Patchin Bank for J. C. W. Seymour, at Detroit. Express charge to Detroit, $3.75." And at the same time of the reception of such package the said company, through Mr. Stanley, one of its authorized agents, gave to the Patchin Bank a receipt in the blank receipt book kept by such bank of the packages it was in the habit of delivering to such express company, and which receipt was in the words and figures following, viz :

        " *Buffalo, Aug.* 19, 1852.

Received of the Patchin Bank of Buffalo, the following package in good order, directed to J. C. W. Seymour, Esq., Cash., &c. Detroit, Mich.     L. F. & CO.,

 Amount, $4,600.       per STANLEY."

In the delivering of the said package and the taking of such receipt, the Patchin Back acted as the agent of the plaintiff, but did not then disclose the fact of such agency. *Sixth.* The regular business of the express company before and at the time of the reception of such package, and which it held itself out to the world to perform in respect of all packages delivered to it, was as follows, viz: Upon the reception of such packages by the express company they were taken in charge by such

company at its office; they were then transported in vehicles owned by said company and in charge of its servants, to the rail road depot at Buffalo, or to one of the steam boats leaving the port of Buffalo, when they were put on board either of a baggage car upon such rail road, or on board of such steam boat. If placed upon the rail road car they were placed in a baggage car devoted to the transportation of packages in charge of such express company. In all cases, whether such packages went forward by rail road or steam boat transportation, an agent of the express company was sent forward with them having such packages under his special charge and supervision. The freight upon such packages, and all charges thereon, were in all cases paid by such express company, the owner of such packages paying no further or other charges than such as the express company charged or received at the time of the receipt of such packages. Upon the arrival of such packages at any terminus of a route, whether by rail road or steam boat, such packages, if they were to go still further forward, were taken by the agents and servants of such express company in vehicles owned by it and under charge of its servants, and transported to the next point of rail road or steam boat departure, as the case might be, and then again taken forward by such new route in the same manner and under charge of agents of such express company as above set forth; and this mode of transportation in all respects was continued until the said packages reached the city or town of their destination, when they were taken in vehicles of the said express company and delivered by servants of such company to the parties to whom they were consigned or directed. Such regular course of business was well understood by the public and by the Patchin Bank at the time of the delivery of the package of bonds above described. The said express company had no interest in any of the lines of public conveyance by which said packages were carried, or in the moneys received by the persons or corporations owning such lines of public conveyance. *Seventh.* The said package of bonds so delivered to the express company as

Sherman *v.* Wells.

aforesaid, on the 19th of August, 1852, was put in charge of a servant of the company, and on the same day was taken in a wagon belonging to the said company, to the steam boat Atlantic, then lying at Buffalo, and which was then engaged in running from Buffalo to Detroit. It was placed in a carpet bag with a quantity of gold and other valuable papers and packages, in like manner delivered to such company for transportation, and upon its arrival at the steam boat, was taken to a state room on board of such boat, hired by the servant of the company, having such package in charge, and in such state room was placed an iron safe belonging to the said express company, in which such package was locked up by such servant and the key thereof kept by himself. The said steam boat left Buffalo on the evening of the same day for Detroit. The boat was commodious, staunch, safe and seaworthy; such servant slept in the above named state room, and while he was so sleeping, and at about 2 o'clock A. M. of the 20th of August, 1852, a propeller navigating Lake Erie came in collision with the Atlantic, striking her near her bows and making a breach in her side, through which the water rushed rapidly, and the boat commenced sinking at her bows. A large number of passengers were on board, about 300 of whom were drowned in consequence of the collision and sinking of the steamer. The boat filled rapidly and went down, bow first, at an angle of about 30 degrees, until the bows touched the bottom, leaving a part of the stern of the boat out of water, from which the remainder of the passengers were taken off by a vessel which came to the assistance of the sinking steamer. It was about two hours after the collision when the last of the passengers left alive were taken off, but the fact that the steamer was sinking and must go down was apparent within a very few minutes after the collision took place. It was probably physically possible for the servant of the express company to have taken the carpet bag in his hand and carried it on board of the assisting vessel, but none other than a man of most extraordinary and unusual coolness and self-possession in the pres-

ence of such a casualty, would have undertaken it, and to have attempted to do so would have been attended at the time with additional peril to the life of the messenger by reason of its tending to encumber him, and by reason of the confusion which prevailed among the passengers. The iron safe containing the bonds in question went down with the steamer, and said bonds were in the safe when it went down. The express company had no interest in the steamer Atlantic, or in her profits, and was in no way interested in the business which she was then engaged in. The servant of the said company, in charge of the bonds, was saved by the vessel which came to the assistance of the sinking steamer. *Eighth.* Said bonds were at the time of their loss worth the amount of principal and interest then due upon them. They all bore date, April 8th, 1850. After their loss, the plaintiff and defendant both joined in attempts to induce the state of Michigan to pay such bonds as lost bonds, which the said state refused to do; and having advertised for said bonds to be presented at the proper office for payment, said state stopped the interest upon them, from and after the 30th of January, 1853. *Ninth.* The said express company had not either conditionally or otherwise promised the plaintiff to pay him the amount of said bonds. *Tenth.* The whole amount of principal was due upon said bonds at the time of their loss in the Atlantic, with interest thereon, at the rate of six per cent, from the 8th day of April, 1850, and no part of that sum had since been paid.

Upon these facts, the referee determined as matter of law, as follows, viz: *First.* That the American Express Company received such bonds as common carriers, to be carried by such company from the city of Buffalo to the city of Detroit, and there delivered to Mr. Seymour, at his place of business. *Second.* That the said company did not by special contract or otherwise limit or restrict its liability as such common carriers. That the plaintiff upon the foregoing facts was entitled to judgment against the defendant for the sum of $6634.46, being the amount of principal and interest due upon the bonds.

Sherman *v.* Wells.

For which sum, with costs, judgment was entered, and the defendant appealed.

*W. A. Hardenbrook,* for the appellant.    I. The defendants were guilty of no negligence to charge them for the loss of the Michigan bonds.

II. The defendants are not common carriers, or responsible as such.    (*Roberts* v. *Turner,* 12 *John.* 232.    *Brind* v. *Dale,* 8 *Car. & Payne,* 207.    *Hersfield* v. *Adams,* 19 *Barb.* 577.)

III. For all losses by navigation the general owner, or owner *pro hac vice* of the vessel, is the common carrier, and alone responsible as such.    (*New Jersey Steam Nav. Co.* v. *Merchants' Bank,* 6 *How.* 344.    *Green* v. *Clarke,* 2 *Kernan,* 343. *McIntyre* v. *Bowne,* 1 *John.* 229.    *Gracie* v. *Palmer,* 8 *Wheat.* 605.    *Clarkson* v. *Edes,* 4 *Cowen,* 470.    *Marcardier* v. *Chesapeake Ins. Co.,* 8 *Cranch,* 39.)

IV. The defendants, by their course of business, known to the plaintiff, restricted their liability; their general receipt to the contrary notwithstanding.    (26 *Eng. L. and Eq. Rep.* 297. 2 *Duer,* 480.    *Van Santvoord* v. *St. John,* 6 *Hill,* 158.    *Parsons* v. *Monteath,* 13 *Barb.* 353.)

V. The plaintiff was entitled to recover no more damage than the bonds were worth as the evidence of a debt; parol testimony in case of their loss being also admissible to establish the demand.    (9 *John.* 96.    2 *Parsons on Cont.* 441, 465.)

*I. T. Williams,* for the plaintiff.    I. Expressmen are *per se* common carriers.    (1 *Parsons on Cont.* 201.    2 *Duer,* 480.) This very company has been held to be a common carrier. (*See Russell* v. *Livingston,* 19 *Barb.* 346.)

II. It is wholly immaterial whether the defendant owned the vehicles of transportation, or not.    (19 *Barb.* 352.    14 *id.* 555.    9 *id.* 322.    19 *Wend.* 332.    3 *Sandf.* 613.)

III. The defendant owned the conveyance a part of the distance, which in any view brings the plaintiff within the cases in 3 *Sandf.* 248, and 8 *M. & W.* 421.

IV. The case of *Roberts* v. *Turner,* (12 *John.* 232,) does

not militate against this position. That was the contract of a forwarder and not of a carrier. (*See p.* 233.) See also Ld. Kenyon's definition of a common carrier, or rather his "criterion." See criticisms on this case, 19 *Wend.* 332; 9 *Barb.* 322. The transaction in question has the following indications that the defendant acted and contracted as, and in fact was, a common carrier. (1.) The defendant received the whole of the consideration of carriage and delivery. (2.) Freight was charged by the defendant for the whole route. (8 *M. & W. p.* 421.) (3.) The parcel was never delivered to the steam boat officers or owners, and was never in their custody. (4.) The package remained in the exclusive custody of the defendant, and was so at the time of the loss. (5.) When lost, the bonds were in process of transportation, and in the exclusive custody of the defendant. What more than this can ever exist as the elements that go to constitute a carrier? (6.) It was the uniform business of the company to transport not only money but bulky articles. (7.) They ran cars on the rail roads. (8.) They had exclusive control of the state room and had a permanent fixture in it in which the bonds were locked up. (9.) Suppose, instead of riding, the messenger had walked to Detroit, would he then have been a carrier? If so, suppose that while on his way he had got into a cart or wagon and rode a few yards or miles, and during that time had met with a misfortune that had resulted in the loss of the bonds, would this have affected his liability? (10.) The party who carries is, in the eye of the law, the party who has the profits of carrying. Of a very necessity all others must be merely agents of a party who has the benefit; the party who has the benefit is the "party in interest." Shall a party have the benefits of an enterprise and still shift responsibility? This would be in the teeth of every legal analogy. (11.) Who did undertake to carry this package? Some one did, or the defendant is liable as a trespasser. Was it the boat? The officers of the boat neither knew nor had the means of knowing that it was on board; had no control over it whatsoever.

Sherman *v*. Wells.

V. The measure of damages is the face of the bonds, unless the one party prove it to be more, or the other prove it to be less. (*Sedg. on Dam.* 512, 13. 1 *Cowen*, 240. 10 *M. & W.* 575. 2 *Rawle*, 241. 2 *Taunt.* 440. 1 *Barn. & Adol.* 528. 3 *Camp.* 476. *Angell on Carr.* § 285. 13 *East*, 509. 2 *Par. on Cont.* 471.)

VI. It is immaterial whether the defendant be a common carrier or no; for there was an absolute contract to carry and deliver. (2 *Meeson & Welsb.* 421.)

*By the Court*, DAVIES, P. J. The facts are succinctly and correctly stated in the referee's report, and the only question presented is, are the defendants liable for the loss of the bonds intrusted to them? That the defendants are common carriers, cannot, we think, be doubted. It was settled that they were, in the case of *Russell* v. *Livingston*, in this court, (19 *Barb.* 346.) The judgment in that case was reversed in the court of appeals, (16 *New York Rep.* 515,) but on an entirely different point. The defendants being, therefore, common carriers, and there being no special contract, the parties are to be supposed to have acted with a full knowledge of their legal rights and liabilities, and must be held to the stringent rule of law which makes a carrier an insurer against all except the act of God and the public enemy. (*Dorr* v. *The New Jersey Steam Navigation Co.*, 1 *Kern.* 485.)

When goods are intrusted to a carrier and not delivered according to contract, the value of the goods, with interest thereon from the day when they should have been delivered, is the measure of damages. (*Sedgwick on Damages*, 255.) We think the proof fully authorized the referee to find that the bonds were of their par value, and that no injustice has been done the defendants in this respect.

The judgment appealed from will therefore be affirmed, with costs.

[NEW YORK GENERAL TERM, September 20, 1858. *Davies, Sutherland* and *Hogeboom*, Justices.]