SAMUEL HARRIS and others *v.* HORACE J. MOODY and JACOB R. TELFAIR.

Goods carried on deck, according to the custom of the trade by steamboats navigating Long Island Sound, and stowed in the usual way, are liable to contribution by way of general average for a loss occasioned by a jettison of other goods necessarily thrown overboard under stress of weather and while subjected to the perils of the sea.

Bank bills of individuals, so carried for them, in a crate, by an express company, which company, by agreement with the owners of the steamboat, pay such owners a fixed sum annually for the carrying of a stated number of portable crates, with the contents thereof, are bound, when saved, to contribute for such a loss.

All property on board the vessel at the time of the jettison, and saved, unless attached to the persons of the passengers, is to be brought into contribution.

Bank bills are to be regarded as property, the goods and chattels of the owner thereof; and in case of loss, the owner is entitled to recover the nominal or par value thereof, in the absence of any proof of depreciation, with the interest thereon.

Bank notes transported by an express company, for the owners, under such an arrangement between it and the owners of the vessel, as is above stated, are to be deemed as paying freight, and therefore as forming a part of the cargo of the vessel.

THIS is an action to recover a parcel of bank bills amounting to the sum of $1,171, retained by the defendants who claim a lien thereon. Such lien is set up under the following circumstances. The steamboat Connecticut, proceeded on a voyage from the city of New York to Allyn's Point, in the state of Connecticut, on the afternoon and evening of the 17th of October, 1856, and encountered a heavy gale, whereby she sustained great damage, losing her smoke stack and forward mast, and being greatly strained and injured. The storm continued unabated, and it was evident that the vessel would go down, unless she could be brought round; and to do this it was essential and necessary, for the general preservation, to lighten the boat, and in consequence thereof, with a view to general safety a large amount of cargo was jettisoned, by means

whereof the steamboat was enabled to turn and finally to enter Huntington Harbor in safety, from whence she was brought to the port of New York on the succeeding day. The cargo which was jettisoned was not under cover, but according to the established usage and custom of the trade, by steamboats running between New York and Allyn's Point, was carried on the main deck of the steamer, the space below that deck being, as usual, occupied by the engine, boilers, coal, &c., and by the passengers. Most of the cargo jettisoned was laden upon the upper or main deck of said boat, along each side of the ladies' cabin, and between the stern of the boat and the paddle boxes, being the space according to usage and custom appropriated to cargo. A cabin is built upon the said deck, and occupies a space in the centre of the vessel, and equi-distant from each side of the boat, and between the sides of the cabin and the sides of the boat the said cargo was stowed. The bank bills, for the recovery of which the action is brought, belonged to the plaintiffs, and were by them entrusted and delivered at Baltimore, to Adams & Co., express agents and forwarders, to be by them transported to and delivered at Boston to the plaintiffs' agent. Said bills, at the time of the jettison, were in a crate or case belonging to Adams & Co., which was laden on board the said vessel. By the agreement between Adams & Co. and the owners of said steamboat, the said Adams & Co. were, in consideration of a fixed annual sum paid by them, permitted and allowed to transport on said boat, a stated number of portable crates, with the contents thereof. And the said Adams & Co. made and collected their own charges for the transportation of the contents of said crates from the parties who employed them. The owners of the boat claimed that the said bills were liable to contribute in common with the other property saved, to the payment of the general average loss occasioned by the jettison, and for that purpose returned the said bills, and delivered them to the defendants in this action, who were at the commencement thereof,

in the possession of the same as the agents of the said owners, to secure the payment of the contributing share of such general average loss, for which said owners and the defendants insisted that the said bills are liable to contribute as part of the cargo of the vessel. These facts were agreed upon by the parties to this action, and upon them the judge, at the trial, directed the jury as matter of law, that the plaintiffs were not entitled to recover; and that the defendants were entitled to their verdict, to which ruling and direction the plaintiffs excepted. Thereupon, the jury gave their verdict for the defendants, and assessed the value of the property taken, at $1,171, and $134.33 as damages for the detention thereof. And the justice directed said exceptions to be heard in the first instance at the general term of the superior court of New York. That court overruled the exceptions, and gave judgment for the defendants (see 4 Bosw. 210), and the plaintiffs appealed to this court.

*John E. Burrill*, for the appellants.

*Daniel Lord*, for the respondents.

DAVIES, J. Two questions are presented for consideration and determination upon this appeal. 1. Whether jettisoned goods stowed on the deck of a steamer are entitled to the benefit of general average. 2. Whether the particular species of property belonging to the plaintiffs in this action, and retained by the defendants, is liable to contribute for the general average loss. These questions will be considered in the order stated.

By the Rhodian Law, as cited in the Pandects, if goods were thrown overboard, in a case of extreme peril, to lighten and save the ship, the loss being incurred for the common benefit, is to be made good by the contribution of all. (3 Kent's Com. 232.) The necessity of the jettison in the present instance, and that the goods sacrificed were

the price of the safety of the vessel and of those saved, are conceded in the statement of facts. Chancellor KENT, in 3 Com., p. 239, lays down the rule, as deduced from the authorities cited by him, that goods shipped on deck contribute, if saved, to the average loss, but if lost by jettison, they are not entitled to the benefit of general average, and the owner of the goods must bear the loss without contribution; and the reason assigned by him for this rule is that the goods, by reason of their situation upon deck, increase the difficulty of the navigation, and are peculiarly exposed to peril. And a further reason for the rule is stated, that the carrier, in that case, is not responsible to the owner, unless the goods were stowed on deck without the consent of the owner, or a general custom binding him, and then he would be chargeable with the loss. Citing as authorities Consulat. de la Mer, chap. 183; Ord. de la Mar, 3, 8, 13; Emerigon, chap. 12, §42; *Smith* v. *Wright* (1 Caines' Rep. 43); *Lenox* v. *United Insurance Company* (3 John. Cases, 178); Boulay Paty, tome iv, 566; Code de Commerce, art. 421; *Dodge* v. *Bartol* (5 Green, 286); *Brig Thaddeus* (4 Martin's Louis. Rep. 582); Abbott on Shipping, 5th Am. ed. 578; Story on Bailments, 339; *Johnston* v. *Crane* (Kerr's N. B. Rep, 356); *Wolcott* v. *Eagle Ins. Co.* (4 Pick. 582).

*Smith* v. *Wright* (supra), was an action to recover the value of goods shipped on deck and ejected. It was proved, in that case, that goods on deck, if lost, are paid for by the underwriters on those goods, without contribution from the assurers of the vessel or other parts of the cargo, and one merchant testified that he once owned goods stowed on deck which were lost by jettison, and being uninsured, he claimed nothing from the owner of the vessel or the other part of the cargo; that he conceived it to be the general understanding that for goods ejected from the deck no contribution is to be made by the owner of the vessel or of other goods. The court held that the owner was not entitled to general average, as the shippers of

goods under hatches and the insurer on the ship and cargo was not liable to contribution, on account of their pre-sumed ignorance of any part of the cargo being placed in so perilous a situation. The point decided in the case was that the carrier was not liable for the loss of goods shipped on deck, when thrown into the sea for the preservation of the ship and cargo. In *Lenox* v. *United Insurance Company* (supra), the court held that for stores shipped on deck and insured, and thrown overboard to lighten the vessel, the underwriters were liable only for a partial loss, and that a loss of the lading on deck could not be charged as general average. *Cram* v. *Allen* (supra), was decided on the authority of these cases, and also that of *Dodge* v. *Bristol* (supra). And the reason assigned for the rule is that goods laden on deck are peculiarly exposed to peril, and increase the difficulty and dangers of navigation.

It is to be observed here, that this rule has only been applied to sailing vessels, and for the sole reason that the lading of the goods on the deck increased the difficulty of the navigation, and it was consequently regarded as unjust that that portion of the cargo which imperilled the vessel and the other parts of the cargo, if thrown overboard, should be compensated for. Its presence in the particular locality was regarded as in some degree the cause of the peril, or at least its destruction was called for to ensure the safety of the residue, by reason of its dangerous locality. This general rule is also enunciated by Abbott on Shipping, at page 78, and he says the reason of the rule, as given by Valin, is that goods so carried embarrass the navigation of the ship. But Valin adds, that he thinks this doctrine should be controlled by the usages of the trade; and, accordingly, that contribution may be claimed for goods thrown overboard from the deck of small coasting vessels or river craft, which usually carry a part of their cargo on deck. (Tom. 2, p. 203; See 1 Emer. 640.) An examination of the cases will show that the rigor of this rule has been greatly departed from, and one adopted more

in consonance with the habits and usages of trade as now practiced, and the modes adopted for the transportation of freight upon water. It might, perhaps, be sufficient to show the inapplicability of the rule as laid down by Chancellor KENT, to say that it was made and applied exclusively to sailing vessels, and the reason given for its adoption can have no force as applied to ships propelled by steam. That reason was that the goods carried on deck embarrassed the navigation, because thus placed there; that to remove them made the vessel more easily navigable, and thus tended to ensure her safety. No such reason has any application to a vessel propelled by steam. The space under deck of this particular vessel was otherwise appropriated than for cargo; and the parties in this action have agreed that it was the established usage and custom, upon this particular boat, to carry its cargo on the main deck. The reason of the law ceasing, the law itself ceases, and the case might safely, I think, be left here. But an examination of the authorities will show that there are exceptions to the rule, and that even in the present case, if the vessel upon which these goods had been laden, were a sailing vessel, the goods jettisoned would have been entitled to a general contribution. We have already noticed the exception made by Valin, of small coasting vessels or river craft, which usually carry a part of their cargoes on deck. This demonstrates that the rule, as he understood it, applied only to sea voyages. This vessel was in the sound, and usually carried her cargo on deck. These facts, show how inapplicable to her, is a rule made to govern voyages at sea. and especially in reference to vessels navigated with sails. Arnould on Ins. (2 vol. 890) in discussing this doctrine of jettison, observes, that the most important exception is that of goods *carried on deck*, which as they tend to embarrass the navigation, are not contributed for if jettisoned, unless they are so carried according to the common usage and course of trade on the voyage for which they are shipped. On proof however of such usage, they are contributed for if jettisoned

like other goods, and no notice to the underwriters of the existence of such custom is necessary in order to make them liable; they being bound to know the usage of the particular trade. Thus carboys of vitriol, timber on the voyage between London and Quebec, and pigs between London and Waterford, have been contributed for, after jettison, though carried on deck; a usage of trade being proved in each case, so to carry them. The authority cited to sustain the proposition that goods carried on deck, because they tend to embarrass the navigation, are not contributed for if jettisoned, has been already referred to. The authority of Valin for the exception made has already been adverted to. Other cases recognize the same exception. *Brown* v. *Cornwell* (1 Root Conn. R. 60,) was decided in 1773. The question put to the court in that case was, whether stock, (horses) shipped upon the deck, in case it is thrown overboard, to save the vessel and the rest of the cargo, will entitle the owners to an average upon the goods, &c., shipped in the hold of the vessel, that was saved. The court determined that the law was so, that it did; that although stock upon deck is more exposed to damage, and in a storm exposes the vessel to greater risk than goods in the hold, yet as it is the universal custom to ship goods in the hold, with stock upon deck, when the stock upon deck is thrown overboard for the express purpose of saving from destruction the cargo in the hold, it is but reasonable that the cargo saved should bear a proportion of the loss, which was the price of its ransom. In *Gould* v. *Oliver* (4 Bing. N. S. 134), it was held that the proprietor of goods laden on the deck of a ship, according to the custom of a particular trade, is entitled to contribution from the ship owner for a loss by jettison. TINDALL, Ch. J., in delivering the opinion of the court, observed that Valin lays it down that the rule in article thirteen, does not apply in respect of boats and other small vessels going from port to port "when the usage is to load merchandise on the deck." The latter

words of which textwriters give the reason for throwing such case out of the exception, into the general rule for contribution, at least so far as the ship is concerned. He says that as to the authorities in the English courts, there is no one which states directly that goods laden on deck, shall in no case be entitled to contribution. The question, however, whenever it has arisen in our courts, has been between the owner of the goods thrown overboard and the underwiter. And the rule generally established seems to have been, that for goods so laden, the underwriters are not responsible. (*Ross* v. *Thwaite*; Park on Insurance, 26; *Backhouse* v. *Ripley*, id.) To the same point may be cited *Lenox* v. *United Insurance Company, supra;* and that the owners are not liable, *Smith* v. *Wright* and *Cram* v. *Aiken, supra.*) But Ch. J. TINDALL proceeds to observe that in *Da Costa* v. *Edmonds* (4 Campb. 142), it was left to the jury to say, whether there was a usage to carry goods on deck, of the description of those thrown overboard; and the jury having found such usage, the underwriters were held liable. The case now under consideration does not, indeed, arise between the same parties, but it appears to fall within the same principle. *Da Costa* v. *Edmonds*, was an action on a policy of insurance, to recover from the underwriters the value of forty carboys of vitriol, stowed on deck and thrown overboard in a storm, on a voyage from London to Lisbon. It appeared that carboys of vitriol were very frequently carried on the decks of ships, but that it was likewise usual to stow them below, bedded in sand, in which situation they are considered safe. Lord Ellenborough left it to the jury to say whether it was usual to carry vitriol on the deck, and whether these carboys were properly stowed. If there was a usage to carry vitriol on the deck, the underwriters were bound to take notice of it without any communication of such usage, and all they could require was, that these carboys should be properly stowed, in the usual manner. On the other hand, they were not liable, if the

goods were carried on deck without such a usage; or if they were not stowed there in a skillful and proper manner. The jury found for the plaintiffs, and a rule was refused. The case of *Milward* v. *Hibbert* (3 Queen's Bench, 120; S. C. 2 Gale & Davis. 142) is quite to the point. It appeared that a quantity of pigs in the course of a voyage from Waterford to London, were thrown overboard from the deck where they were stowed. It was insisted that for the deck-stowed pigs no contribution could be claimed. The court thought otherwise, and Lord DENMAN in delivering its opinion, said: "The practice appears to have been not to lay it down as a rule of law, that for goods stowed on the deck, the owner of them shall be excluded from the benefit of the general average, but to receive evidence of commercial men respecting the usage of the trade and the general understanding of those engaged in it (and in insuring), which may obviously vary, and require from time to time, fresh evidence and different explanations."

I arrive at the conclusion, therefore, that the rule laid down by the earlier writers, as applicable to sailing vessels upon a sea voyage, has no relation to the voyage of the steamer Connecticut, upon its voyage up the sound from the port of New York to that at Allyn's Point; and that if it had, the usage established in this case to stow the goods on deck takes it out of that rule, and brings it within the exception, early recognized and so frequently followed. It results, therefore, that the vessel and cargo of the steamer became liable to contribute to the loss of the goods jettisoned, notwithstanding the same were stowed upon the deck of the steamer. It may also be observed that the rule is universal that goods stowed on deck, if saved, contribute to the general loss, and it is not perceived, on principle, why, as they contribute to the general loss, they should not also be entitled to be contributed for, when destroyed for the general safety.

The next question is whether the particular species of property belonging to the plaintiffs in this action, and

retained by the defendants, is liable to contribute for the general average loss. By the Rhodian law every thing on board the vessel saved contributed to make up the loss, and in the essay on that law concerning jettison, translated from the digests and code of Justinian, it is said: Several merchants had loaded various quantities of goods on board the same ship, in which were several passengers, both freemen and slaves. In consequence of a violent storm, a jettison became indispensible. It was asked whether all must contribute to the jettison, and whether those must contribute who had goods on board the vessel such as pearls, jewels, &c., and whether there must be a contribution for the heads of freemen, and by what action it could be enforced. It was determined that all must contribute who had an advantage from the jettison, because it was a tribute due by those things which had been preserved, and therefore that the owner of the vessel was bound to contribute for his share; the amount of the jettison must be apportioned according to the value of the goods. It has also been agitated whether an estimation is to be made of the clothes and jewels of every person; and it was unanimously agreed that they should contribute. Arnould thus announces upon what property contribution is to be levied: "All which is ultimately saved out of the whole adventure (i. e., ship, freight and cargo), contribute to make good the general average loss, provided it had been actually at risk at the time such loss was incurred, but not otherwise, because, if not at risk at the time of the loss, it was not saved thereby." (2 Arnould, 921.) Gold, silver, jewels, precious stones and all other small articles of value, unless carried about the person, contribute. He, says Mr. Phillips, thinks that bank notes, being not so much property as evidences of property, ought not to contribute. Nesbett, he observes, considers that they should, and his seems to be the better opinion, for they are convertible into money and are saved by the sacrifice from becoming valueless. (2 Arnould, 923.) Phillips says: As much of the cargo on

board at the time of making a jettison, or other sacrifice for the general safety, as finally arrives at the port of delivery, or comes to the use of the owner, contributes in general average.

Mr. Benecke says: Passengers ought to contribute for their trunks and luggage, because if cast overboard their value is allowed for. Phillips says, this reason does not appear very satisfactory—a plainer one seems to be, that the baggage is benefitted by the jettison in proportion to its value, in comparison with its whole value at risk, precisely as any other property is so. Emerigon is of the opinion that of right and upon general principles, every thing belonging to passengers, even to their wearing apparel, is liable to contribution. Valin considers the wearing apparel, jewels, rings, ornaments, and in general whatever a passenger habitually wears, uses or carries about his person, during the voyage, including his change of linen, to be exempted from contribution, by the concurrent authority of the ordinances and writers. And Phillips says this seems to be the general practice. He adds: If any part of the baggage is of sufficient value to be worth bringing into contribution, no reason has been given why it should not contribute a part of the contributing interest. The reason for exempting wearing apparel and the like seems to be that the persons of those on board are not brought into contribution, and the exception extends to things which are merely necessary to the person. This discussion shows how universally all that is on board ship, at the time of the jettison, and saved from the impending peril, is called upon to contribute, and the only exception is the persons on board and what is necessarily attached to them. And the reason given for the exemption of the person on board is, that it is impossible to estimate the value of freemen. Slaves, on board at the time of jettison, have been valued, and made subjects of contribution. PARK, Justice, in *Brown* v. *Stapyleton* (4 Bing. 119), says: The rule is that all merchandize put on board for the purpose of traffic, is

liable to be brought into contribution, and in merchandize is included all property of great value, unless attached to the persons of the passengers, but property so attached does not contribute. It may therefore be considered as settled by text writers and by judicial authority, that all property, on board at the time of the jettison, and saved, unless attached to the persons of the passengers, is to be brought into contribution.

It remains to be considered whether the parcel of bank bills, belonging to the plaintiffs, are to be regarded as property. That they are so treated by the plaintiffs is apparent from the pendency of this action. The complaint alleges that the defendants have become possessed of and wrongfully detain the following *property* of the plaintiffs: that is to say, one package of bank bills of the value of $1,171. In the face of this allegation, it will hardly be permitted to the plaintiffs to argue that this package of bank bills is not property, and has no actual value.

In *Turner* v. *Fendall* (1 Cranch, 116), the supreme court of the U. S. held that money may be taken in execution, if in the possession of the defendant. That it could be levied on and seized, as the goods and chattels of the defendant. In *Handy* v. *Dobbin* (12 Johns. 220), an execution was issued against the goods and chattels of Handy, by virtue of which the officer seized two five dollar bank bills of the goods of Handy. SPENCER, J., in delivering the opinion of the court, observed that there can be no doubt that the constable, under the attachment, could take any goods and chattels which could be levied on by execution. The authority in both cases is the same. Bank bills are treated, *civiliter*, as money; a tender in them is good, unless it be specially objected to at the time. The question then is narrowed to this: can money be levied on by execution? This court, he says, in *Williams* v. *Rogers* (5 Johns. 167), intimated strongly their concurrence in the decision of the supreme court of the United States, in 1 Cranch, 133. In that case, all the cases on the point were reviewed, and it

was held that money could be levied on. We now fully concur in the doctrine then advanced. We perceive no objection in principle why money should not be taken in execution. It is the goods and chattels of the party; and it appears to us to comport with good policy as well as justice, to subject everything of a tangible nature, excepting such things as the humanity of the law preserves to the debtor, and mere choses in action, to the satisfaction of the debtor's debts. (See also *Ontario Bank* v. *Lightbody*, 13 Wend. 102.) *Sherman* v. *Wells*, (28 Barb. 403) was an action to recover certain bonds of the state of Michigan, of the nominal amount of $4,600, entrusted to the defendant as a common carrier, and which were lost by the sinking of a vessel on Lake Erie, upon which they were for transportation. The defendants were held liable to pay the amount of the principal and interest of the bonds. The measure of damages was held to be the face of the bonds, unless the one party prove it to be more, or the other prove it to be less. (Sedg. on Dam. 512–13; 1 Cowen, 240; 10 M. & W. 575; 2 Rawle, 241; 2 Farm. 440; 1 Barn. & Adol. 528; 3 Camp. 476; Angell on Carr. § 285; 13 East, 509; 2 Par. on Contracts, 471.) It would seem, therefore, to be well settled, that bank bills are to be regarded as property, the goods and chattels of the owner thereof; and that in case of loss, the owner is entitled to recover the nominal or par value thereof, in the absence of any proof of depreciation, with the interest thereon. Such being their nature and properties, they were clearly subjected as property, to the burthen of contribution, in the case under consideration.

But it is claimed, on the part of the plaintiffs, that under the arrangement between Adams & Co. and the owners of the steamboat, the bank notes in question paid no freight, and therefore formed no part of the cargo of the vessel. We have seen from the authorities that it is not an essential element in the liability to contribution that the property on board should form a part of the cargo of the

vessel. The inquiry is, in testing its liability to contribute, was the particular property or thing saved on board at the time of the jettison, and in peril? If so, its duty or liability to make contribution is fixed, except in the particulars heretofore alluded to. It is true that Myers says: "What pays no freight pays no average;" but this doctrine is very generally repudiated, and no authority is cited to sustain it. Even the same author qualifies this, in that he means to exclude from contribution only the wearing apparel and ornaments belonging to the person, by saying: "If a passenger should conceal in his trunk, or about his body, any such considerable sum of money or jewels as would not be suffered without paying feight, he must contribute to the jettison." Here the things concealed formed neither a part of the cargo or paid freight, yet this author declares their liability to contribute. Mr. Stevens says: It would be very unjust that the master, or any other person who had goods on board, should not contribute because he pays no freight.

But it is apparent from the facts presented, in this case, that in truth compensation was paid to the owners of the steamboat, for the transportation of this particular species of property. It is of no moment that the same was made in a fixed sum, for the carrying by the year, the crates with their contents. The payment was in fact made for the transportation of the crates, the parcels therein being placed there for safety and convenience. And it is also a matter of no importance that such compensation or freight was paid in the first instance by Adams & Co. Adams & Co., collected their own charges for the transportation from the plaintiffs and others who employed them, and we cannot fail to see that a portion of these charges must have been a share or proportion of the sum paid by Adams & Co. for the transportation on the steamboat of this particular parcel from the port of New York to Allyn's Point. We conclude, therefore, that this particular parcel of bank bills formed a part of the cargo of

this steamer, and freight was paid therefor. It was not necessary, to make it a part of the cargo, that it should have been specifically received, and designated as such, or that to determine the question whether or not freight was paid on it, the sum should have been paid specifically, on this identical parcel. We therefore arrive at the conclusion as well upon principle as authority that the bank bills of the plaintiffs on board of the steamer, for transportation at the time of the jettison, are to be deemed and taken as property, and are bound to contribute, to the general average loss. If these views are correct, the judgment appealed from should be affirmed.

HOGEBOOM, J. The general rule undoubtedly is, that goods shipped on deck, contribute if saved, but if lost by jettison, are not entitled to the benefit of general average. (Abbott on Shipping, part 4, chap. 10, sub. 3; 3 Kent's Com. 240; *Smith* v. *Wright*, 1 Caines, 43.)

But the rule has its qualifications.

1. It is strictly applicable only to those vessels which are expected to encounter the extraordinary perils of the sea, and not to those which navigate smoother waters, and are comparatively safe from extraordinary exposure. (2 Smith's Leading Cases, 531; Abbott, 481, 482.)

2. The custom and usage prevailing on the particular route navigated, as to the place on the vessel where the cargo is stowed or located, has a material bearing upon the right of the jettisoned cargo to contribution for loss. If by such usage the cargo is stowed on the main deck, and not under cover, then it becomes not only liable to contribution if saved, but entitled to contribution if lost. (2 Smith's Leading Cases, 531; *Gould* v. *Oliver*, 4 Bingham, N. C. 134; *Brown* v. *Cornwall*, 1 Root [Cow.] 60; *Barbour* v. *Bruce*, 3 Conn. R. 9; *Barbour* v. *Dodge*, 5 Greenleaf [Maine], 286; 22 Pick. 116; 1 Parsons' Maritime Law, 307, 308, 309.) By the terms of the stipulation in this case, it is fairly inferrible not only that the main part of

the cargo was actually stowed on the main deck, but that it was the only place in the vessel where it could be located. In such a position it was as safe as elsewhere from such perils as vessels of that description on the route which they pursued would be likely to encounter. To deny to a cargo thus placed the right to contribution for loss, in the event of a necessary jettison, would be practically to ignore all title to contribution in all ordinary cases. The rule of contribution would be nullified, and the practice of general average terminated.

The bank notes in question formed a part of the *cargo* of the steamboat. They were packed in a *crate*, and the crate paid freight. Whether such freight was an aliquot part of a fixed annual sum, or a reasonable and customary charge for the particular voyage, cannot alter the question. It was still freight paid for the transportation of the particular crate in which these bills were; and if for the crate, then also for its contents, for it was the contents of the crate and not the crate itself which induced the shippers to undertake the transportation and incur its expense. It was therefore a part of the cargo or burthen carried. It embraced the two important elements which enter into the definition of cargo, to wit: 1. A part of the load or burthen of the vessel. 2. A part of the articles which produced freight or compensation to the carrier. (Abbott on Shipping, part 4, chap. 10, sub. 12, p. 502.)

Nor were they within any of the various exemptions or exceptions which exclude certain articles from being considered as a part of the cargo, and therefore not liable to contribution.

1. They were not like small parcels of money or evidences of debt, wearing apparel or ordinary baggage attached to the person of the passenger and under his personal care and supervision. They were placed among the ordinary goods, wares and merchandize which constitute the cargo of the vessel, exposed to its perils and sharing its fate. (2 Arnould on Insurance, 888 [Am. ed.]); 1 Phil-

lips on Insurance, 172 [2d ed.]; 2 do 152; 3 Kent's Com. 210; *Nelson* v. *Belmont*, 21 N. Y. Rep.)

2. They were within the protection of the contract made between the shipper and the carrier. We are entitled to infer, from the course of the business, that the carriers were entirely aware of the character of the packages conveyed by the express companies, and that they include packages of money as well as other small parcels of value.

3. They were also *property*, within the meaning of that term as applied to articles which might legitimately form a portion of the cargo of the vessel. They were *money* in the ordinary definition of that term, and among the most valuable kinds of property. They pass from hand to hand equally with gold and silver as a part of the ordinary currency of the country. They are liable to levy and sale on execution. (*Handy* v. *Dobbins*, 12 Johns. 220; *Turner* v. *Fendall*, 1 Cranch, 33. See Parsons on Maritime Law, 323.)

They were something more than mere evidences of debt, and, if not, were none the less articles of personal property. They were subjects of barter and sale, and if improperly detained or lost, could be recovered or sued for in replevin or trover. Nor could their place be supplied, in case of loss, by similar papers without loss of identity. True, evidence of the loss might in some cases be successfully procured and thus the loss wholly or partially remedied. A new note or bill might be substituted for the one lost; yet it would not be the same note or bill. It is not more than in other cases the loss of mere evidence or proof of property, but of property itself having intrinsic and appreciable value. If, on proof of loss, the amount of the bill or note should subsequently be recovered of the party liable to pay, the pursuit of this remedy should be imposed on the carrier and not on the owner. *Prima facie* the loss of the bills should be treated as a loss of the debt they represent. The payment of the loss by the carrier would transfer the title to him, and the burthen and risk

of .its subsequent. recovery should devolve on him.   (See 1 Park on .Insurance, chap. 7, § 2, page 293; Abbott on Shipping, 502, part 4, chap. 10, sub. 12; *Brown* v. *Stapleton*, 4 Bing. 119.)

It is said that choses in action, bonds, bills, notes, mortgages, deeds, evidences of debt, and of title are exempt from contribution, and therefore that bank bills should be. I do not understand that in cases similarly circumstanced to the present they would be so exempt.   They are ordinarily exempt because accessory to the person, but not so in any instance when they pay freight and become part of the cargo proper.

It is said that subjecting bank bills to liability is the introduction of a new principle, and would be disastrous if practically carried out, because if liable to contribute when saved, they are equally entitled to contribution if lost, and that 'the large sums and extraordinary values thus brought into the account for contribution would absorb the price of less valuable property, and therefore dictate the rejection of the principle.   This consideration cannot be indulged.   In the first place, jettison of articles of such light weight and such great value, is not permitted except in cases of emergency, and therefore they are much more likely to suffer than to exact contribution.   In the next place there is no practical injustice in allowing and enforcing contribution according to a just valuation; and in the third place the question does not here arise *to what extent* these bank bills shall be made to contribute; for the plaintiffs refused to recognize the lien altogether, and therefore the defendant was warranted in refusing to surrender the property if the lien existed to the slightest amount.   It was a question of lien or no lien, and not of amount of lien.

In my opinion the bank bills were bound to contribute to the loss.   The bills were justifiably detained to respond for such loss; and the judgment should be affirmed, with costs.

INGRAHAM, J., concurred in above opinions, as to all except that bank bills are property, under the law relating to contribution and average. Upon that point he was for reversal.

All the other judges being for affirmance, judgment affirmed.