MILWAUKEE & ST. P. R. CO. (DREW v.). See Case No. 4,079.

MILWAUKEE & ST. P. R. CO. (HOWARD v.). See Case No. 6,761.

MILWAUKEE & ST. P. R. CO. (KELLOGG v.). See Case No. 7,664.

MILWAUKEE & ST. P. R. CO. (MINNETT v.). See Case No. 9,636.

MILWAUKEE & ST. P. R. CO. (UNITED STATES v.). See Cases Nos. 15,778 and 15,779.

MILWAUKEE & S. R. CO. (SMITH v.). See Case No. 13,082.

---

## Case No. 9,627.

### The MILWAUKEE BELLE.

[2 Biss. 197:[1] 9 Am. Law Reg. (N. S.) 311; 3 Am. Law T. Rep. U. S. Cts. 65; 2 Chi. Leg. News, 50; 17 Pittsb. Leg. J. 148.]

District Court, D. Wisconsin. Nov. Term, 1869.

SHIPPING — JETTISON — GENERAL AVERAGE — ON DECK.

1. Goods laden on deck with consent of the shipper under a bill of lading excepting "dangers of navigation," and necessarily jettisoned, do not make a case for general average.

[Approved in Wood v. The Sallie C. Morton, Case No. 17,958. Criticised in The William Gillum, Id. 17,693; The Watchful, Id. 17,-250. Disapproved in Wood v. Phoenix Ins. Co., 1 Fed. 240.]

2. The fact that the shipment on deck was sought by the master for the purpose of trimming his vessel, held not to be material.

Libel for contribution for loss by jettison of a quantity of pig lead, shipped on board this schooner at the port of Racine, in the state of Wisconsin, to be transported to the port of Buffalo, in the state of New York. By the bill of lading, the pigs of lead were

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

shipped on deck, in good condition, to be delivered in like good order, the dangers of navigation excepted. The schooner was laden with wheat in bulk.

Cary & Rea, for libellants.
Emmons & Van Dyke, for respondents.

MILLER, District Judge. [Libellants shipped on board this schooner at the port of Racine, in the state of Wisconsin, divers pigs of lead to be transported to the port of Buffalo, in the state of New York. By the bill of lading the pigs of lead were shipped on deck, in good condition, to be delivered in like good order, the dangers of navigation excepted. The schooner was laden with wheat in bulk. It is alleged in the libel, that at the time the lead was received on board, the vessel was so badly stevedored, that she was not in a proper condition to safely take it on deck, or to safely transport it according to the tenor or effect of the bill of lading, or to safely and securely hold and carry the under-deck cargo. And that the vessel being in an unseaworthy condition, set sail on her intended voyage with the lead on board. And, by reason of the vessel not being well trimmed, and not in condition to resist the ordinary perils of the sea by reason of said improper trimming, and not by any embarrassment or danger caused by the lead being on deck, the officers and crew of the vessel jettisoned the lead from off the deck into the waters of Lake Michigan, whereby the lead became wholly lost, and was not delivered according to the tenor and effect of the bill of lading. Libellants demand strict proof whether the jettison was made necessary by a peril of the sea, or from improper stowage of the under-deck cargo. And if jettison were made necessary by a peril of the sea, then by the custom and course of the admiralty and maritime laws, they claim that the loss is a case of general average loss. Claimants in their answer confess the shipment of the lead, and they urge that the vessel being tight, staunch and strong, and well manned, equipped, and having a cargo of 14,700 bushels of wheat in her hold, sufficiently and properly stowed and secured, and forty tons of pig lead shipped on deck, pursuant to the bill of lading, left the port of Racine, bound for the port of Buffalo, and while on the voyage on Lake Michigan, she encountered a severe gale, labored hard, shipping much water on deck, filling herself, and rendering it necessary to knock away the bulwarks to free her, and the gale increasing, it became necessary for the preservation of the vessel, and of the lives and officers of the crew, and for the safety of the whole, the officers, on consultation, determined to jettison a portion of the lead, and thereupon they jettisoned about 838 pigs, and on arriving at Buffalo, the whole cargo was delivered, except the pigs of lead jettisoned. It is also averred that the cargo under deck was not a full cargo, and was so known to the agent of the shippers, and the lead was shipped on deck at the request of said agent. The answer further alleges that the loss so occurred by a peril of the sea, is not a general average loss, nor is the same to be contributed for in general average.] [2]

It is agreed between the advocates of the parties that the storm was of force and violence sufficient to render the jettison necessary. The proof sustains the allegation that the master solicited the lead for the purpose of trimming his vessel. The proof does not establish a custom to ship lead on deck. That has been done in several instances for the purpose of trimming grain bearing vessels, but to establish a custom derogating from the general law, it is not enough to prove that the act has been frequently done. It must be proven to be so generally known and recognized, that a fair presumption arises that the parties in entering into their engagement, do it with reference to the custom, and tacitly agree that their rights and responsibilities shall be determined by it. This case does not rest on custom, there being an express agreement between the freighter and the master of the vessel, that the lead should be stowed on deck.

The question presented for the consideration of the court is, is the loss of the lead by the jettison a general average loss? The general cargo having been delivered at the port of destination, upon payment of the freight, the demand is against the vessel alone for her proportional contribution. Under the view taken of the point presented, I will not consider whether this libel can be maintained against this vessel, after delivery of the cargo.

It appears that the master having ascertained that his vessel was not trimmed, applied to the agent of the owner of the lead, to ship it on deck, for the purpose of trimming the vessel for the voyage, and thereby rendering her sea-worthy. From this fact negligence is not chargeable to the master, in respect to putting the vessel in trim. The jettison was rendered necessary by a peril of the sea, for the safety of the vessel and cargo, and was a loss by the peril of the sea.

It is a general and an ancient rule of the law of shipping that goods shall not be carried on deck. Reasons for this rule are, that goods placed on deck are more liable to be lost by being swept overboard, and to damage by water, and endanger both ship and cargo, as the weight is put far from the hold, and thereby makes the vessel less stable and less manageable, and more apt to labor in a heavy sea. And it encumbers the deck and embarrasses the crew in working a sail vessel, and perhaps the common safety sometimes may not require jettison if lading were not on deck to bring the dangers on the vessel, or contribute to enhance them.

The rule is also a general rule, that goods

---

[2] [From 9 Am. Law Reg. (N. S.) 311.]

laden on deck and jettisoned are not contributed for, and such is particularly the rule when goods are laden on deck by consent of the shipper. I have had this matter under consideration in former cases, and must dispense with reference to the very numerous cases affirming this rule. Maritime orders and rules, both ancient and modern, recognize the distinction between cargoes placed on deck with consent of the freighter, and cargoes under deck. They do not give a recourse against the master, the vessel, or the owner. The admiralty courts of England and America have almost uniformly treated the owner of goods on deck with his consent, as not having a claim on the master, in case of jettison, although bound to contribute.

This being a proceeding against a sail vessel, I shall not enter upon the consideration of some modern judgments against vessels propelled by steam. The case of Lawrence v. Minturn, 17 How. [58 U. S.] 100, is referred to as a leading case of binding authority. The ship Hornet was libelled for non-delivery of two steam boilers and chimneys shipped at New York, on deck by special agreement, and consigned to libellants in San Francisco. It being discovered on the voyage, that the ship could not be navigated with safety in a storm, the deck load was thrown overboard. The facts in the case show that the jettison was justifiable, and the loss occasioned by the peril of the sea. The court says "This bill of lading declares that the property is to go on deck. It excepts perils of the seas. The exception must be construed with reference to the particular adventure, which the contract of the affreightment shows was contemplated by the parties. Under this bill of lading, the question is, not what in other circumstances could be deemed a peril of the sea, but what is to be deemed such when operating on this vessel, with this deck load. If a very burdensome cargo like iron is taken on board, and heavy weather met with, and jettison made, it would not be a ground of claim against the owner that the weather encountered would not have been sufficient to justify a jettison, if the cargo had been cotton. And when this freighter consented to place on the deck of this ship his boilers and chimneys, weighing upwards of thirty tons, not distributed about the deck, but lying in a small space, must he not be taken to have known that their necessary effect might be to embarrass the sailing of a ship in a gale of wind, and cause her to labor in a heavy sea?" The libel was dismissed. In this case libellants having shipped on deck eleven hundred and sixty pigs of lead weighing about forty tons, they consented that the vessel might thereby be rendered less manageable, and more liable to labor in a storm, and they, and not the vessel, must bear the loss of a portion of the deck load by the necessary jettison.

It is contended that in equity the vessel should contribute for the loss, as the deck load was used in putting her in trim for sea. That is begging the question. I cannot enter into consideration of the inducement to the contract of the parties.

The libel will be dismissed.

NOTE. See The Wellington [Case No. 17,-384], and cases there referred to.

The general rule that there is no contribution for goods laden on deck is held in The Paragon [Id. 10,708]; Lennox v. United Ins. Co., 3 Johns. Cas. 178; Johnston v. Crane, 1 Kerr, 356; Wolcott v. Eagle Ins. Co., 4 Pick. 429; Cram v. Aiken, 13 Me. 229; Taunton Copper Co. v. Merchants' Ins. Co., 22 Pick. 108.

In Barber v. Brace, 3 Conn. 13, it is held that a parol agreement that goods may be stowed on deck, made after the delivery of the bill of lading, is a good defense to a loss occasioned by such stowage. But when it is customary to carry a certain class of goods on deck the rule has been relaxed. Gould v. Oliver, 4 Bing. N. C. 676; Brown v. Cornwell, 1 Root. 60; Rogers v. Mechanics' Ins. Co. [Case No. 12,016]; Toledo, etc., Ins. Co. v. Speares. 16 Ind. 52. And in Milward v. Hibbert, 2 Gale & D. 142. the owners of pig lead loaded on deck, having been allowed contribution in general average on showing a usage so to carry, the ship-owner recovered against the underwriters; and Denman, C. J., reviewing the English authorities, says that they fall far short of the rule that owner of deck cargo can in no case recover in general average.

A distinction has also been made between sail vessels and steamers, the distinction going to the reason of the rule. Hurley v. Milward, 1 Jones & C. 224; Gillett v. Ellis, 11 Ill. 579; Harris v. Moody, 4 Bosw. 210, approved by the court of appeals in 30 N. Y. 266; Merchants' & Manufacturers' Ins. Co. v. Shillito, 15 Ohio St. 559.

The supreme court have entirely settled the rule that a clean bill of lading imports a contract that the goods shall be stowed under deck, and that parol evidence that they were to be stowed on deck. is inadmissible. The Delaware. 14 Wall. [81 U. S.] 579. This was a case of jettison of pig iron. and the court expressly limit their decision to the case where no usage or custom of a particular trade is shown sanctioning a stowage on deck, no proof of such usage having been introduced in that case.