## The William Crane.

## Merryman et al. v. The William Crane.

### (District Court, D. Maryland. November 13, 1889.)

SHIPPING—DAMAGE TO FREIGHT—STOWAGE OF CARGO.
    Cotton stowed on the main deck of a large coasting steamship for a voyage from Savannah to Baltimore, under the upper deck, in a space between the main deck and the upper deck, inclosed by the iron bulwarks and by strong shutters and bulkheads, *held* to be properly stowed, although not under the hatches of the main deck. *Held* that, the stowage being in a protected place, and customary and proper, the cotton could not be said to be carried "on deck," and the steamship was not liable for damages from sea water, caused by an unusual storm, which flooded the decks, and broke down the bulkhead, and tore away the protections.

(*Syllabus by the Court.*)

In Admiralty. Libel by Merryman & Co. against the steamer William Crane for damage to cargo.

*Fisher, Bruce & Fisher*, for libelants.

*Wm. P. Whyte*, for respondent.

MORRIS, District Judge. This is a libel to recover for damage by sea water to 80 bales of cotton shipped on the steamer William Crane, to be carried from Savannah to Baltimore. The decision of this case depends upon whether the cotton was stowed in a place on the steamer where, under the bill of lading, it might rightly be placed. The William Crane is a large iron steam propeller, intended for the coastwise trade, and above her main deck has an upper deck, on the top of which are structures containing pilot house, officers' quarters, and staterooms for passengers. Along the sides of the ship this upper deck is not altogether permanently inclosed, but may be inclosed when required for carrying cargo. The space between the main and upper decks is seven feet in height. Four feet of this height is permanently defended by the iron bulwarks and rail of the ship, and the remaining three feet between the rail and the upper deck has wooden shutters, which can be tightly fitted in, and made fast between the permanent uprights which support the upper deck, thus inclosing the entire space. The middle of the ship between the main and the upper deck is occupied by permanent structures containing the engine room and quarters for the engineers and others, leaving an alleyway on each side. The forward end of each alleyway is closed by a heavy bulkhead with doors. It was in these alleyways that the cotton involved

in this controversy was stowed. It was raised somewhat from the deck by dunnage, and was kept in place by uprights, which left a narrow gangway alongside the engine room house. On the voyage from Savannah to Baltimore the steamer encountered a severe storm, and shipped a heavy sea on the starboard side near the bow, and just forward of the bulkhead inclosing the starboard alleyway. The wave boarded the vessel with such force that it flooded the forward main deck, broke down the bulkhead on the starboard side, wrenched off seven feet of the wooden shutter next to it, and, crossing the ship, burst open the iron cargo ports in the bulwarks on the port side, and carried away a portion of the port rail. The water flooded the starboard alleyway, and saturated the cotton so that it suffered damage to the extent of $10 a bale. There was also a portion of the same shipment, containing 13 bales, which was placed upon the open deck, forward of the bulkheads, in the space between them and the forecastle, which were damaged by the same sea. As to these 13 bales the owners of the steamship admit her liability, and have tendered payment of the damage. The owners of the steamship deny their liability for the damage to the 80 bales of cotton stowed between the upper and main decks, contending that it was properly stowed, and that the damage was caused by a peril of the sea, within the exception in the bill of lading.

The libelants rely upon the established rule that a clean bill of lading such as was given upon the shipment of this cotton imports that the goods are to be carried under deck, and not on deck. *The Delaware*, 14 Wall. 579. They contend that, as the cotton was not under hatches below the main deck, its stowage does not gratify the contract. Unquestionably, on sailing vessels, "under deck" is held to mean beneath the hatches, in the place devoted to the under-deck cargo. On a sailing vessel no other place is protected from the spray and water, and in no other place can cargo be placed so as to leave the decks free and unobstructed for the handling of the sails and the navigation of the ship. But on steamers navigating our inland and coastwise waters on short voyages this is not the rule, because the reason for it ceases. The size and stability of such steamers enables them to carry extensive upper works, built high above the main deck, and they have no need to keep the main deck clear for handling sails, or for any of the requirements of navigation. Goods placed upon the main deck in such steamers are as safe as those placed below, if the space thus used is sufficiently protected, and provided the goods are not of such weight as to disturb the proper trim of the ship. This has frequently been declared to be the rule. It was so held in *The Neptune*, 6 Blatchf. 194; *Harris* v. *Moody*, 30 N. Y. 266; *Gillett* v. *Ellis*, 11 Ill. 579. It is matter of common observation that cargo is constantly so carried on such steamers.

The question in this case, to my mind, is therefore not whether the cotton was carried under the hatches of the main deck, but whether it was carried in a protected place, under cover, and where experience had demonstrated it would be safe. The alleyways under the upper deck, inclosed with the wooden shutters already described, were designed in

the planning of the ship as a place for carrying cargo. The cubical contents of these spaces was included in ascertaining the tonnage of the vessel by the custom-house authorities. It is not suggested that carrying cargo there, if it be of the proper weight, in any manner makes the ship less seaworthy. Cotton in bales is not damaged by a slight wetting, and its light weight in proportion to its bulk makes it proper to be carried on the upper part of a vessel. It seems to me, then, that the only question is whether or not the construction of the shutters on the sides and the bulkheads in front of these alleyways was such as to be reasonably safe as a protection from the waves which the ship might be expected to encounter. Considering the location was in the midship section of a large steamer, and considering the elevation above the surface of the sea, I am of opinion that the shutters and bulkheads were sufficient in strength for the purpose for which the builders of the steamer designed them. It is objected that the space was not sufficiently inclosed because the after ends of the alleyways were not protected by bulkheads, and that a sea coming aboard from astern would reach the cotton, but the fact is that nearly the whole width of the stern was filled up by the passenger saloon, which nearly closed the after ends of the alleyways, and it could hardly be that any but a small amount of spray could reach the cotton from that direction. In this case the proof shows that the water which caused the damage came with great violence from near the starboard bow, and not from the stern. It is true that on this voyage the bulkhead was bursted in, and a portion of one shutter torn away, but the violence of the wave must have been extraordinary, and the occurrence an exceptional one, such as will occasionally do great damage to the strongest vessel. The testimony of the master, who has been navigating this steamer for four years, carrying cotton in the same manner, is that he never had such cotton damaged, either before or since this voyage, and the testimony of a number of other witnesses who are familiar with the business of similar steamers carrying cotton from Savannah to northern ports is that their experience justifies them in considering such a location on the vessel as safe for cotton as below the hatches of the main deck. I do not think the libelants are entitled to recover for the damage to the 80 bales sued for in their libel.