## THE KIRKHILL.

### (Circuit Court of Appeals, Fourth Circuit. February 6, 1900.)

### No. 309.

**1. SHIPPING—CHARTER PARTIES—CLEAN BILLS OF LADING.**

A British ship was chartered to carry cotton to Germany in November, when storms are likely to be encountered. For a distance amidships, and extending from side to side, was an upper deck house, supporting the officers' bridge, in which erection were gaps forward and aft of the bridge, where the main deck was left open. The covering over the midship part of such deck space had fore and aft passages on each side leading out, which were called "alleyways." At the front end of each alleyway was a door opening out on the open main deck. Bales of cotton were placed as close as possible on the outboard side of such passage, so as to leave a narrow gangway alongside the cotton for the passage of the crew and engineers. The spaces were covered over, but could not be permanently closed in, as the doors in the end have to be opened by the crew in passing in and out. The spaces could not be made water-tight, because they could not be covered by tarpaulin covers, and the doors had to stand the full impact of the seas which might sweep over the deck. *Held,* that the master of the ship was justified in refusing to give a clean bill of lading for the cotton stored in the alleyways, under the general rule that a clean bill of lading negatives any carriage except under deck.[1]

**2. SAME—CONSTRUCTION OF CHARTER PARTY.**

A charter party of a British ship provided that bills of lading were to be signed when presented, without prejudice to the charter party, for any portion of the cargo, and at any rate of freight. It also provided that the whole of the steamer, including cross bunkers, bridge, deck bunkers, alleyways, peaks, lazarettes, space under bridge, deck, etc., consistent with the steamer's seaworthiness, and all covered-over spaces on deck, should be placed at the disposal of the charterers, for their sole use. The English Board of Trade, in its official manual to surveyors, directs that permanent erections, with one or more openings in the sides or ends, not fitted with doors, or other permanently attached means of closing them, shall not be measured or included in the tonnage. The charter party gave the net registered tonnage, and guarantied a certain number of cubic feet "of actual cargo space available for cotton in bales," in consideration whereof freight was to be paid at a certain sum per ton, net register, British measurement. *Held,* that the clause placing "at the disposal of the charterers" certain additional deck spaces did not impose on the master of the ship the duty to sign clean bills of lading for cotton stored in alleyways spaces on deck, which could not be permanently closed because of the crew being compelled to pass through such spaces.

Appeal from the District Court of the United States for the Eastern District of North Carolina.

Thomas Evans, for appellant.

Harrington Putnam, of Cowen, Wing, Putnam & Burlingham (George Rountree, on the brief), for appellee.

[1] As to bills of lading, see note to The Dunbritton, 19 C. C. A. 465.

Before SIMONTON, Circuit Judge, and PAUL and BRAWLEY, District Judges.

BRAWLEY, District Judge. The British steamship Kirkhill, of 2,347 tons net register, and guarantied to have at least —————— cubic feet of actual cargo space available for cotton in bales, was chartered September 13, 1897, to load a full and complete cargo of cotton from the port of Wilmington, N. C., to Hamburg, Bremen, Amsterdam, or Rotterdam. The ship commenced loading on October 16th, and in progress of loading a dispute arose as to whether the charterers had the right to load cargo in certain alleyways which at that time, as appears from the master's protest, were filled with coal for the voyage. At a later date, and before the loading was completed, the master removed the coal there stowed to the deck, and gave notice to the charterers that he would stow cotton there, but that he would only sign bills of lading for the alleyways cargo at the shippers' risk, as the cotton stowed in the alleyways would be necessarily exposed to the weather during the voyage, and might meet with some damage. To this proposal the charterers objected, and demanded a clean bill of lading for the part of the cargo to be stowed in the alleyways. Upon the refusal of the master to give such clean bills of lading, the ship was cleared for Bremen on November 5, 1897, and this libel was filed, alleging damage caused by the refusal to sign clean bills of lading for the proposed alleyways cargo. The district court held that the libelant had no right to demand a clean bill of lading for this portion of the cargo, and dismissed the libel.

The sole question for decision is whether the charterer was entitled to demand clean bills of lading for cotton which was to be carried in the alleyways spaces on deck. The record does not contain a precise description of the steamship Kirkhill, but the alleyways spaces were described in the argument before us by the proctor for appellee, and the description was accepted as substantially correct, and is about as follows: For a distance amidships, and extending from side to side, is an upper deck house which supports the officers' bridge. There are gaps in this deck erection forward and aft of the bridge, where the main deck is left quite open. The covering over the midship part of such deck space is for the protection of the engine room and the quarters for the men, with fore and aft passages on each side leading out. These are the alleyways. At the front end of such a passage or alleyway is a door of wood or iron opening out upon the open main deck, and, when cotton is stowed there, bales are placed as close as possible in the outboard side of such passage, so as to leave a narrow gangway alongside the cotton for the passage of the crew and engineers. Such spaces are covered over, but cannot be permanently closed in, as the doors at the end have to be opened by the crew in passing in and out. They cannot be made water-tight, because they cannot be covered, as are the hatches, by tarpaulin covers, which prevent possibility of leakage. These vertical doors at the front of the alleyways have to stand the full impact of the seas which may sweep over the deck.

The damage which might occur to cotton stowed there was described in the recent case of The William Crane (D. C.) 50 Fed. 444. In that case, on a voyage from Savannah to Baltimore, the steamer encountered a severe storm, and shipped a heavy sea on the starboard side near the bow, just forward of the bulkhead inclosing the starboard alleyway, and the wave boarded the vessel with such force that it flooded the forward main deck, broke down the bulkhead on the starboard side, wrenched off seven feet of wooden shutter next to it, and, crossing the ship, burst open the iron cargo ports and bulwarks on the port side, carrying away a portion of the port rail, flooding the starboard alleyway, and saturating the cotton so that it suffered damage to the extent of $10 a bale. The district court was satisfied, by the testimony in that case, that this location in that vessel was "as safe for cotton as below the hatches of the main deck," these alleyway spaces being designed in the planning of the ship for carrying cargo, and that the established rule that a clean bill of lading imports that the goods are to be carried under deck was not applicable to "steamers navigating our inland and coastwise waters on short voyages."

There is a difference in the construction of American coastwise steamers and British cargo steamships, but the record does not enable us to point it out with precision. It is clear, however, that cotton stowed in alleyways, such as are above described, is subject to special dangers and hazards beyond the ordinary sea perils to cargo carried below and secured under deck. Especially is this the case with cotton shipped for a winter voyage on the North Atlantic in the month of November, when storms are likely to be encountered.

In The Waldo, Fed. Cas. No. 17,056, a portion of a cargo of potatoes was stowed on deck, and a clean bill of lading was given therefor. The ship was held liable for the damage to the deck cargo, although there was some proof that it was stowed on deck with the knowledge of the shipper; the court holding that there is a presumption in every contract of affreightment that the goods shall be secured under deck. "It is for a master, who would exempt himself from the risks of a deck passage, to remove that presumption. The ordinary and proper evidence would be a memorandum to that effect on the face of the bill of lading."

In The Wellington, Fed. Cas. No. 17,384, 635 barrels of apples were shipped from Vermilion, in the state of Ohio, to be delivered at the port of Milwaukee. One hundred and ninety-five barrels had been stowed on deck, and in the storm were jettisoned. A clean bill of lading had been given. Upon a libel to recover their value, the court says:

"I conclude, upon principle and authority both, that parol evidence of agreement or consent of the shipper that his goods may be stowed on deck cannot be received where a clean bill of lading is given, and full freight is charged, as in this case. Here was a clean bill of lading, a transfer of which would vest the title to 635 barrels in the purchasers. The master should have made a memorandum on the bill of lading, or have required the written consent of the shipper on the bill that the number of barrels not receivable under deck might be shipped on deck."

99 F.—37

In some of the earlier cases in this country it was held by some of the state courts that proof of a well-known usage might be received to overcome the presumption from a clean bill of lading, but the weight of the best authorities is that a clean bill of lading negatives any carriage except under deck. Such was the rule in New York, where Nelson, C. J., says in Creery v. Holly, 14 Wend. 26:

"It is true, in this case, that nothing is said in the bill of lading as to the manner of stowing away the goods, whether on or under the deck, but the case concedes that the legal import of the contract, as well as the understanding of the usage of merchants, imposes upon the master the duty of putting them under deck, unless otherwise stipulated; and, if such is the judgment of the law upon the face of the instrument, parol evidence is as inadmissible to alter it as if the duty was stated in express terms."

The case of Lenox v. Insurance Co., 3 Johns. Cas. 178, was an action against the underwriters upon goods partly shipped on deck and partly below for loss sustained by the deck lading having been thrown overboard for the common safety. The court (Chancellor Kent being then chief justice) held 'that the loss of the lading on deck could not be charged as general average. "An insurance does not reach goods on deck unless expressly mentioned. They are not considered as part of the cargo in which the other shippers are interested. The owners of the cargo under cover ought not, therefore, to contribute to the jettison of goods on deck."

The subject had full consideration in The Delaware, 14 Wall. 596, 20 L. Ed. 783, where some pig iron shipped from Portland, Or., to San Francisco, was stowed on deck and jettisoned in a storm. A clean bill of lading was given therefor, and the defense was that, by a verbal agreement between the shippers and the master of the ship, the iron was stowed on deck. The court held that parol evidence of this agreement was inadmissible, and, after a full review of the authorities, Justice Clifford says: "It is the settled law in this court that a clean bill of lading imports that the goods are to be safely and properly stowed under deck." Such is the law in England. Stev. Stowage (7th Ed.) pp. 164–174; Shipping Co. v. Dixon, 12 App. Cas. 11; The Oquendo, 3 Asp. 558. The reason for the rule is obvious. Bills of lading are documents which pass from hand to hand. They enter largely into the commercial business of the world, and the strict rights of the holders must be absolutely maintained, or they will lose a material part of their value as instruments of commerce. As a clean bill of lading imports a carriage under deck,—that is, in the part constructed for the carriage of cargo,—a stowage in any place less safe would work a fraud upon the purchaser or insurer unless the consent to such stowage is expressed in a form to be available as evidence under the general rules of law, and the proper way is to note it upon the bill of lading itself; for, once issued and passing into other hands, its terms cannot be qualified by any provisions in the charter party which, though the original contract, is thereafter res inter alios.

It cannot be doubted that cotton stowed in the alleyways, as above described, would be in a more perilous situation than if stowed under deck. Outside the extra peril from accidental fire communicated by seamen and firemen passing along the alleyways, it is so

nearly certain that the ship would experience gales and heavy seas in a voyage through the North Atlantic to the port of Bremen in that season of the year that the master could not be excused if he failed to act on the assumption that they would occur, and, in case of peril necessitating a jettison, it would be unreasonable not to assume that cotton so stowed, being within easy reach of the crew, would be jettisoned, and it would be a fraud upon the underwriter if the bill of lading failed to give the information necessary to estimate the risk, and calculate the premiums accordingly. If such damage occurred, the holder of an unqualified bill of lading could, in all fairness, hold the ship responsible for emitting a misleading document of title.

It is contended by the appellees that in The Delaware, 14 Wall. 579, 20 L. Ed. 779, and in Lawrence v. Minturn, 17 How. 100, 15 L. Ed. 58, the vessels were sailing ships, and that the expression "on deck" has reference only to open decks, and that those cases cannot properly apply to steamships which have covered spaces securely constructed on deck. We have given due consideration to this contention, but our opinion is that cotton stowed in the alleyway spaces, above described, would, for reasons already stated, be subject to perils other and greater than if stowed below deck; and, as this cargo was destined to a Continental port, it may be well to refer to some of the provisions of the Continental codes as furnishing reasons for precaution by the master. Some of the earlier authorities are cited by Mr. Justice Curtis in Lawrence v. Minturn, 17 How. 100, 15 L. Ed. 58. The codes of France, Holland, and Germany prohibit the carriage of goods on deck without the consent of the shipper, and a late and high authority (Desjardins) thus discusses the question:

"But whether it concerns this house or the poop, even built into the ship and covered like it, the law makes no distinction. This mode of lading resembles much loading on deck, and it is not like loading into the interior of the vessel. It has almost all of the inconveniences of the former, and has not the advantages of the latter. Goods stowed in the interior, as M. Bedarride well explains, are protected by the sides of the ship. They can be damaged by seawater, but will not be carried away unless the ship itself, broken in, or foundering, perishes. Placed in the poop, goods are much more exposed to the invasion of seas. They may even be carried away with the poop, as has often been seen. Finally, such goods are right under the hands of the crew, and are the first they will get rid of, if there is a necessity for a jettison. To load in the poop is to load on deck (Charger dans la dunette c'est charger sur le tillac)." Traité de Droit Maritime, tome 2, par. 431 (Paris, 1880).

Another commentator says:

"Should the provisions which forbid loading on deck be understood as likewise forbidding loading in the poop or in the deck house of the vessel? The doubt arises from the fact that these goods are then under cover. But, in my opinion, that does not suffice. Deck house and poop in reality rise up on the deck; and that which article 229 appears to require is that, unless there is a contrary agreement, the lading should take place in the body of the ship, where the goods are sheltered, without compromising its stability." Valroger, Droit Maritime, tome 1, par. 391 (Paris, 1883).

The main contention of the appellee is that the charter party in this case is a complete contract of affreightment, and that, therefore, its terms bound the ship to its fulfillment, and that the master

had no power to change or modify its terms. The fourth and ninth clauses of the charter party are cited in support of this contention. They are as follows:

"(4) Bills of lading to be signed as and when presented, without prejudice to this charter party, for any portion of the cargo, and at any rate of freight, and when signed, if the marks and number of bale and of packages agree with the mate's receipts, shall (in the absence of fraud or obvious error) be conclusive evidence of the quantity of cargo shipped."

"(9) The whole of the said steamer, including cross bunkers, bridge, deck bunkers (if any), alleyways, peaks, lazarettes, space under bridge, deck, poop, deck room, consistent with the steamer's seaworthiness, and all covered-over spaces on deck, together with such other spaces where steamer has previously carried cargo, or would carry cargo, if she were to load entirely for the owner's benefit, with the exception only of the ordinary side bunkers, engine, and boiler house, engine room, captain's and officers' cabins, and necessary room for the accommodation of the crew, shall be placed at the disposal of the charterers, for their sole use, and no other goods shall be taken on board without their written permission. All wooden bulkheads and shifting boards to be taken down and carried on deck. The owners to furnish the charterers with a complete diagram of the steamer, showing the correct net measurement of every compartment. Any difference in the amount of freight between the bills of lading (and drafts for disbursements referred to below) and this charter party to be settled at port of lading before sailing; if in favor of vessel, by cash at current rate of exchange, less insurance; if in favor of charterers, by usual draft of master, payable three days after arrival at port of discharge, or sixty days after date, whichever occurs first, to the order of the charterers or advancers; and the agents, with the consent of the owners, do hereby authorize the master to sign such drafts, and said drafts shall be a lien against the freight, taking precedence of all other claims."

Construing provisions of a charter party similar to clause 4, Justice Fenner, in Gomila v. Adams, 36 La. Ann. 221, says:

"It is clear to our minds that this clause had no reference to anything but the rate of freight. It simply said to the charterers: 'You are bound, it is true, to pay me the rate of freight agreed upon between ourselves, but you may make contracts with shippers at any rate you please, and insert it in their bills of lading, and we will sign them as presented, provided you pay the difference if the freight is less, and we will pay you if it is greater, than that agreed between us.'"

Judge Brown, in The Sprott (D. C.) 70 Fed. 329, construing these words, says: "This means as lawfully and rightly presented under the charter provisions,"—quoting The Tongoy (D. C.) 55 Fed. 329, where the master, before signing bills of lading which he claimed were incorrect, indorsed on them that a certain amount of cargo was in dispute.

The shippers accepted the bills under protest, and then libeled the vessel. Judge Toulmin, hearing the case upon the merits, dismissed the libel, and says:

"The contention on the part of the libelants here is that under the contract in this case the master was bound to sign any bills of lading presented by the shippers in good faith, whether the quantity of lumber specified in the bills of lading had been actually received or not. [With this contention he did not agree.] My opinion is that under this clause in the charter party * * * he is not compelled to sign bills of lading without reserve."

We are of opinion that this clause of the charter party should not be construed so literally as to require the master to sign any bill of lading that may be presented. Bills of lading become documents of title, which pass from hand to hand, and should state the

truth of the transaction. There should be no misrepresentation of the quantity of goods received, and no suppression of any material fact as to the terms upon which they are to be transported, and any excepted perils or qualifications of liability should be clearly stated; for, while the charter party, where there is one, constitutes the contract, the bill of lading is excellent evidence as to its terms, which should be expressly and correctly incorporated therein. "Unless the bill of lading contains a special stipulation to that effect, the master is not authorized to stow the goods sent on board as cargo on deck; as when he signs the bill of lading, if in common form, he contracts to convey the merchandise safely in the usual mode of conveyance, which, in the absence of proof of a contrary usage in the particular trade, requires that the goods shall be safely stowed under deck." The Delaware, 14 Wall. 604, 20 L. Ed. 784.

We do not think that the ninth clause of the charter party, which placed "the whole of said steamer," including cross bunkers, bridge, deck, bunkers, alleyways, peaks, deck, poop, etc., "at the disposal of the charterers," imposed upon the owners the duty of stowing goods there upon like terms with goods stowed under deck. These spaces are not parts of the ship's hold, and the usual terms, "the whole reach and burden of the ship," would not include such deck spaces. The Kirkhill is a British ship, and in the official manual to surveyors, issued by the board of trade, it is directed that "poops, bridges, or any other permanent erections, with one or more openings in the sides or ends not fitted with doors or other permanently attached means of closing them, should not be measured and included in the tonnage." Instructions Relating to Measurements of Ships, p. 6 (London, 1898). See, also, White, Merchants' Shipping Act, 1894, p. 466, § 85.

The first clause of the charter party gave the net registered tonnage, and guarantied a certain number of cubic feet "of actual cargo space available for cotton in bales, in consideration whereof freight shall be paid as follows: Thirty-six shillings and six pence per ton net register, British measurement." The ninth clause simply placed "at the disposal of the charterers" certain additional deck spaces. It did not require that the charterers should stow cotton in such places on deck under liability for dead freight if they failed to do so, but, these deck spaces being simply "at the disposal of the charterers," it seems to us that it would be unreasonable to impose upon the shipowner the same measure of liability for cotton stowed there which the law imposes when cotton is stowed under deck, and that the master was clearly within his right when he refused to give a bill of lading, except "at shipper's risk," so that an innocent holder would be clearly advised that the cotton was not under deck, which a clean bill of lading would import. In a recent case in the house of lords, it appeared that 25 bales were carried on deck and were jettisoned, the bills of lading for part of the same shipment contained the words "under deck," but as to 25 bales these words were omitted. It was claimed that by the usage in New Orleans steamers trading to Liverpool were in the habit of carrying cotton on deck. Lord Halsbury, chancellor, said:

"It appears to me that there is no real difference between the bills of lading. 'Expressio eorum quæ tacite insunt nihil operatur;' and I think it is clear, therefore, that, this cotton was carried under a contract that it should be stowed under deck. The exception in the bills of lading of 'jettison' cannot avail the shipowners, who broke their contract in stowing the cotton upon deck, and thereby directly caused the loss to the merchants. That this would be the general law was not, indeed, disputed, but it was said that a practice prevailed at Liverpool, so extensively practiced that it must have been known to the plaintiffs, of loading cotton upon deck. But the very same evidence which established the practice established also that the shipowners paid for any damage resulting from the practice. Now, as they could only be called upon to pay as for a breach of their contract, it follows that the supposed practice established no more than this: that a great many people in Liverpool were in the habit of acting in breach of the contract into which they had entered, and were in the habit of paying damages when injury resulted from such breach. How such a practice can be supposed to affect the contractual relations of merchant and shipper I am wholly at a loss to understand, or how the generality of such a practice could alter the legal rights of the parties more than a single example it is equally difficult to discover. Every carrier by land, as by water, when he breaks his contract, and causes damages thereby, is liable to be called upon to make good the damage; but how such a liability, and constant submission to damages for such liability, can license the supposed breach, is a problem that has never been solved." Shipping Co. v. Dixon [1886] 12 App. Cas. 11, 16.

It is well settled that an ordinary policy of marine insurance does not cover goods carried on deck. 2 Joyce, Ins. § 1726. The decree of the district court is affirmed.