**WALKER-ROSS, Inc., v. DODWELL & CO., Limited.**

(District Court, W. D. Washington, N. D.    March 14, 1924.)

No. 6991.

1. **Shipping ⬯153—Evidence held to show contract was for all logs short-shipped on two other vessels.**

In an action by shipowner to recover for freight short-shipped, *held*, that plaintiff sustained burden of proof on it to show that contract was one for shipment of all logs short-shipped on two other vessels.

2. **Shipping ⬯106—Bill of lading is contract, and freight engagement shipper's agreement to furnish cargo.**

The bill of lading is the shipper's receipt and contract of carriage, and the freight engagement is the shipper's agreement to furnish cargo.

3. **Shipping ⬯153—Evidence held to show that parties did not contemplate underdeck stowage.**

In an action to recover for freight short-shipped, evidence, consisting of bill of lading, freight engagement, and correspondence, *held* to show that the parties did not contemplate underdeck stowage, whether or not there was a custom that a bill of lading which is silent as to the place of stowage imports a contract that the goods are to be stowed underdeck.

4. **Shipping ⬯153—Evidence held to show ship had space available for cargo.**

In actions to recover for freight short-shipped, evidence *held* sufficient to show that the ship had space available for the cargo over and above cargo engaged before plaintiff was advised of the probable shortage in defendant's promised cargo.

5. **Shipping ⬯145—Shipowner excused from shipping piling in action to recover for freight short-shipped.**

In action to recover for freight short-shipped, plaintiff was excused from shipping certain piling on the vessel in question, where it appeared that such piling would have to be taken aboard before she went to another port to finish loading, and the piling would have had to be put on deck, where it would have interfered with the loading through the hatches, and it cannot be complained by defendant that plaintiff shipped such piling on another vessel.

In Equity.    Suit by Walker-Ross, Incorporated, against Dodwell & Co., Limited.    Decree for plaintiff.

Cosgrove & Terhune, of Seattle, Wash., for plaintiff.
Huffer & Hayden, of Seattle, Wash., for defendant.

CUSHMAN, District Judge.    Plaintiff sues to recover for freight short-shipped upon the Ohio Maru on a voyage from Puget Sound and British Columbia to Japan.    Defendant had, prior to its agreement to ship logs upon the Ohio Maru, shipped short of its freight engagements for voyages of the Ayaha Maru and Denmark Maru from Vancouver to Kobe and Yokohama.    The agreements for freight for the latter named vessels were formally executed instruments, each of which contained the following provision:

"3. You and the above-named shipper shall be jointly and severally liable to us and to the owners of the above-named vessel, and/or such substituted vessel, if any, in the full sum of all loss and/or damage that we or it or they severally or jointly shall suffer or sustain by reason of any failure to pay the said freight, or any failure to deliver all of the said commodity to the above-named vessel, or to such substituted vessel, if any, for shipment within the

time above specified therefor; all railway and all other defaults in connection with such delivery for shipment shall be deemed to be your and the said shipper's defaults."

The court has heretofore denied defendant's prayer that these contracts be reformed by striking out this provision. The defendant denies that it agreed to ship on the Ohio Maru, upon the same terms, the logs that it had failed to deliver for shipment upon the other two vessels; its contention being that it agreed to deliver as much of the short cargo as could be obtained, and that it did not undertake to deliver any particular amount of cargo. Defendant, in a letter of January 3, 1922, advising plaintiff of its having given direction for the delivery of the cargo contracted to the Denmark Maru, and before it was known that there would be a shortage, closed as follows:

"Against our bookings of 2,500 M to 3,000 M Brereton feet logs, your contracts 58/59, we have now declared 2,600 M feet. As soon as you can let us know whether you want to lift the entire 3,000 M, we will declare the remainder."

Later, in a letter advising plaintiff that it would not be able to make the full shipment, defendant wrote plaintiff:

"We are endeavoring to obtain logs from Vancouver Island and have fairly good prospects of picking up an additional 200 M feet. As soon as we are definitely assured of this we will let you know. Needless to say we will make every effort and co-operate with you in every way possible to complete our contract."

After it was known there would be a short delivery to the Denmark Maru, the last one to sail of these two vessels, plaintiff wrote defendant as follows:

"This will confirm arrangement with you whereby we have reduced your booking on the steamship Denmark Maru to 600 M feet of logs, Brereton scale, for Yokohama discharge. Please arrange to have 300 M feet of these logs alongside steamer at the Great Northern dock for loading Wednesday, February 22d, the balance on February 24th. We thank you for your assurance that the balance of your contract will go forward on the steamship Ohio Maru, loading Vancouver about March 15th to 20th."

After the sailing of the Denmark Maru, plaintiff wrote defendant, in part, as follows:

"* * * 'You already appreciate the fact that we have suffered considerable loss on account of that nondelivery and the losses which we have suffered will to some extent be offset by your delivery to the steamship Ohio Maru, the full amount of feetage which is represented by the difference between the total amount provided for in the two contracts and the amounts delivered to the steamship Ayaba Maru and Denmark Maru. In case of nondelivery to the Ohio Maru of the full amount óf feetage which was short delivered to the Ayaha Maru and Denmark Maru, considerable loss will still rest upon us. It is, therefore, quite essential for our mutual benefit that the full balance of feetage of logs be delivered by you to the steamship Ohio Maru. * * * Please write us fully as to particulars and assurance as to the definite amount of feetage of logs which you will be able to have delivered to the Ohio Maru at Seattle and Vancouver; also give us advice as to marks, destination," etc.

Four days later plaintiff wrote defendant another letter, in part as follows:

"* * * Referring to our contracts with you—No. 058, December 22d, for 1,400 M feet Brereton scale logs; No. 59, December 22d, 1,600 M feet Brere-

ton scale logs: Under these contracts there is still a considerable amount to be delivered to us, and we are expecting to receive from you some of the logs at Seattle and some at Vancouver. * * * Will you kindly see that your suppliers are lined up and that they will not fail to have the maximum amounts delivered to the vessel on and during the dates above stated?"

On the same day defendant wrote plaintiff a letter containing the following:

" * * * We also have your favor of the 4th instant, and fully realize and are doing our utmost to obviate the difficult position which our nondelivery to the steamships Ayaha Maru and Denmark Maru have placed you in. You of course realize, as we are prepared to prove, that this nondelivery was due to causes absolutely beyond the control of either ourselves or our suppliers. We are doing everything in our power to make up the full quantity this time by the steamship Ohio Maru, and have even gone so far as to overbuy considerably, and at higher prices, in order to obtain the required amount. We regret that at the moment of writing we cannot give you anything like a definite line-up, but, as the writer stated to both Mr. Ross and Mr. Walker in our office day before yesterday, it now appears that our maximum will not exceed 1,100,000 feet B. M. Brereton."

[1] Defendant's witness stated that, having failed to secure the logs which defendant intended for shipment upon the Ohio Maru, inquiries were made among all known shippers of logs in the Vancouver market; that the reason defendant failed to secure the logs was not because of an unwillingness upon its part to pay the price demanded; that they were willing to pay any price for the necessary logs. In view of the foregoing, taken in connection with the testimony as to conversation with defendant's agent, Evans, it is clear that plaintiff has sustained the burden of proof, and that the contract was one for the shipment of all logs short-shipped on the other two vessels, with a condition substantially the same as that of paragraph 3 of the original contracts quoted above.

It is further contended upon defendant's part that, in calculating the amount of the short shipment that could have been carried on the Ohio Maru, the court should not take into account the space available for deck cargo; that is, that the same rule should be applied in this case as in that of a clean bill of lading—that is, a bill of lading which is silent as to the place of stowage imports a contract that the goods are to be stowed under deck. The Delaware, 14 Wall. 579, 20 L. Ed. 779; St. Johns N. F. Shipping Corporation, Owner, etc., v. S. A. Companhia Geral Commercial do Rio de Janeiro, 44 Sup. Ct. 30, 68 L. Ed. ——.

[2, 3] It is not necessary to determine whether the evidence in the present case shows a general custom of the port to stow cargo of the character here in question on deck. There would appear to be reasons for not applying the rule invoked in a case such as the present. The bill of lading is the shipper's receipt and contract of carriage. The freight engagement is the shipper's agreement to furnish cargo. When the shipper delivers the freight and a bill of lading is issued, the carrier is in a better position to know where the cargo will be stowed than when it takes from shippers freight engagements; for these are, as a rule, taken prior to the ship's reaching port. The bills of lading in evidence in the present suit for such of defendant's goods

as were carried reserve to the vessel the right "to carry said merchandise on deck." It is true that in its letter of March 8th defendant wrote plaintiff:

" * * * On all of our shipments we shall want two negotiable and three nonnegotiable copies of clean, shipped-form bills of lading claused for alongside delivery, rate of freight and amount of freight money not to show, but to be stipulated, 'Freight as arranged, prepaid.' "

In a later letter to plaintiff, defendant writes:

"Steamship Ohio Maru, Shipping Instructions.—For each of the following items, please make up for us two negotiable, three nonnegotiable copies of clean, shipped-form bills of lading, claused for alongside delivery, 'Freight as arranged, prepaid.' * * *

"If you have not received proper PLIB certificates for the above from the shippers, please let us know promptly and we will see that they are supplied. Also kindly advise us promptly when each parcel is loaded, whether on or under deck, so that we can proceed with our documenting."

The first of these letters, referring, as it does, to "all of our shipments," and the last letter referring only to particular shipments—if the last letter had contained the last-quoted paragraph, and not that first quoted, it might be concluded that the intention to waive the right of stowage under deck—evidenced by the final paragraph—was limited to those particular parcels of freight which were the subject of the later letter. But with this letter demanding in the first paragraph "clean, shipped-form bills of lading," and in the last paragraph recognizing plaintiff's right to stow under deck, it is more reasonable to conclude that by a "clean, shipped-form bill of lading" the parties did not contemplate underdeck stowage. It is concluded that defendant, being familiar with plaintiff's bill of lading form, was by these letters requiring a bill of lading with "nothing in the margin qualifying the bill of lading itself," rather than underdeck stowage. 1 Rawle's Bouvier, Law Dictionary (3d Ed.) p. 358.

[4] The shortage in the freight engagements for the Ayaha Maru and Denmark Maru was 1,045,202 Brereton feet. The further question is presented of whether the Ohio Maru had space available for this cargo, over and above that required for her original contracted cargo; that is, other cargo engaged before plaintiff was advised of the probable shortage in defendant's promised cargo. The first definite assurance of this shortage was on March 8th. The Ohio Maru finally began her voyage on the 30th of March. Early in March the Denmark Maru, a sister ship of the Ohio Maru, began a similar voyage with a deck load of 510,000 feet board measure. It is clear from the evidence, and not disputed, that if the Ohio Maru could have safely carried a deck load equal to that of the Denmark Maru, there was available space for all of defendant's promised logs. But it is contended that the Ohio Maru could not do so. There is no evidence of any inherent difference in the two ships to the advantage of the Denmark Maru in this respect. The evidence shows the cargo of the two ships to have been of much the same character; such difference as there was in the stowage of the cargo, the amount and character of ballast, was in favor of the Ohio Maru, as was also the season of the year, which was more advanced for the voyage of the Ohio Maru,

which, as stated, began March 30th. The testimony is that the British Board of Trade Rules fix the beginning of summer for March 31st, and that the San Francisco Board of Underwriters fix it 15 days earlier. These circumstances are more convincing than the opinion evidence of witnesses that the Ohio Maru could not have safely carried a deck load of 500,000 feet. The marine surveyor in charge of the San Francisco Board of Marine Underwriters for British Columbia, who surveyed both the Ohio Maru and the Denmark Maru prior to the voyages in question, testifying as a witness for the defendant, said that the average height of a deck load on shelter deck of such a vessel was six feet; that the deck load of the Denmark Maru was approximately six feet; that a vessel of the type of the Ohio Maru ought to carry on deck slightly above 500,000 feet of logs. The evidence shows that plaintiff, from the time of being definitely advised of a probable shortage in defendant's contracted cargo, used all reasonable diligence to secure in place thereof substitute cargo.

[5] It has been contended that certain cargo shipped by plaintiff on other vessels should have been taken upon the Ohio Maru. There is but one item of this character that requires consideration: There were certain piling which it appears plaintiff might have shipped on the Ohio Maru. These piling were at Seattle, and would have had to be taken aboard before she went to Vancouver to finish loading. Owing to the length of the piling and the cargo already aboard, the piling would have had to be put on deck, where it would have interfered with the loading through the hatches at Vancouver. This excused plaintiff from shipping them on the Ohio Maru.

The amount of the credit to be allowed defendant for amount received on account of substitute cargo, while in issue under the pleadings, is not in dispute under the evidence.

Decree accordingly.