## THE VELMA LYKES.
### No. 267.

District Court, S. D. Texas, Houston Division.
April 3, 1934.

Fulbright, Crooker & Freeman, Carl G. Stearns, and T. S. Taliaferro, all of Houston, Tex., for libelant.

Royston & Rayzor, of Houston, Tex., for respondents.

KENNERLY, District Judge.

This is a suit in admiralty by libelant, in rem against the S. S. Velma Lykes, and in personam against her owners Lykes Bros. Steamship Company, Inc., to recover for the loss in part and damage in part of 125 drums and 210 cases of salad oil, delivered by libelant to respondents on board the S. S. Velma Lykes on or about October 29, 1932, at Houston, Tex., for transportation on such steamship, under bill of lading hereinafter set forth, to the port of Cristobal, Canal Zone.

(a) It is stipulated that libelant was the owner of the goods shipped, at the time of their loss or injury, and is the proper party to maintain this suit. Also that it has complied with the provisions of the bill of lading as to giving notice of its claim, and that: "if the libelant is entitled to recover herein, it is so entitled to recover the sum of Fifteen Hundred Seventy-nine and 60/100 Dollars ($1,579.60), together with any interest which the Court may see fit to allow."

(b) The bill of lading, prepared by libelant on printed forms for that purpose, is a "Clean Bill of Lading" of the kind discussed in The Delaware, 14 Wall. (81 U. S.) 602, 20 L. Ed. 779, and by this court in The Southlands, 27 F.(2d) 1010. It contained certain exceptions hereinafter quoted and discussed.

(c) Libelant's cargo was stowed by respondents in the bridge deck space (sometimes referred to by the witnesses as the shelter deck space) of the Velma Lykes. Such space is between the bridge deck and the main deck, and is a fully covered extension of the sides or walls of the ship above the center of her main deck, its width being approximately the same as that of the ship, and its length being approximately one-third of that of the ship. The construction of the four sides and top which inclose such space is substantially the same as the sides of the ship below the main deck, except that the plating is much thinner than the plating below the main deck.[1] Such space has four doors, two fore and two aft. Along the ends of the doors are sets of "dogs" about four inches apart, with screws and knuckles so that, when the doors are closed, the "dogs" are automatically brought down and tightened up. Inside the doors are rubber gaskets. There are also three openings or hatches from this space up onto the bridge deck, one on the starboard side, one on the port side, and one forward. These openings or hatches are secured by waterproof tarpaulins and by wedges which are driven into cleats on the sides to prevent the tarpaulins from being blown or washed off.

Except that it perhaps requires more care in the stowage of cargo in this space, because more affected by the motion of the ship in storms than space below the main deck, I have been able to discover, from the evidence, no substantial or material difference between this space and the space under or below the main deck, and find that it was as safe place for the stowing and carriage of libelant's cargo in hurricane or in ordinary weather as space under or below the main deck, and respondents were not negligent in stowing and carrying it there.

Further, the loss or injury to libelant's cargo was not due to the fact that it was carried there instead of under or below the main deck.

(d) There was customarily carried by the Velma Lykes, and carried on this voyage, in her bridge deck space some extra equipment (a winch and other equipment). The evidence does not show respondents to have been negligent in carrying this extra equipment in such space either in hurricane or ordinary weather.

(e) The evidence shows that, before sailing from Houston, this extra equipment, libelant's cargo, and other cargo in the bridge deck space, were stowed, lashed, and secured therein in a careful and prudent manner, and I find respondents were not negligent in that respect. This was likewise true of cargo in other parts of the ship.

(f) Shortly before the steamship sailed from Houston, a warning from the United States Weather Bureau was received by respondents, indicating a storm at sea of no great intensity some 2,000 to 3,000 miles southeast of Houston, but with nothing to indicate its probable course. Had it, however, been definitely known at the time the steamship sailed that it would encounter (as it did) a hurricane, the extra equipment in the bridge deck space, libelant's cargo, and the other cargo in such space, and elsewhere in the ship, could not, according to the evidence here, have reasonably been made more secure or safer than they were. I find respondents were not negligent in sailing when they did, nor in the manner of stowing and securing such extra equipment and all such cargo, either in contemplation of hurricane or ordinary weather.

---

[1] See three photographs and "Stowage Plan" in evidence.

■ (g) The steamship sailed from Houston, October 31, 1932, properly and efficiently manned, equipped, and appareled, her extra equipment and cargo carefully and securely stowed and safeguarded, and she was in seaworthy condition in every respect. She would doubtless have had a safe voyage but for a hurricane. Without reviewing all the evidence, the story of the voyage is so well told by log of the steamship that I quote therefrom, calling attention to the record of the position of the ship, the wind velocity, the action of the ship, and injury thereto, and to its cargo, and particularly to the remarkable record of the action (italicized) of the ship's barometer, showing the seriousness of the storm:

"*Oct. 31*, 3.10 PM left dock; .50 PM departure, NNE breeze and moderate easterly sea.

"*Nov. 1*, noon position 27.24 longitude 92.31, course 137, distance 151, average speed 11.2. Partly cloudy, moderate NE breeze and sea.

"*Nov. 2*, noon position 25.25, longitude 89.30 W. course 137, distance 245, cloudy fresh breeze and moderate easterly sea.

"*Nov. 3*, noon position 21.27 N. longitude 86. 21 W. course 135, distance 251, *barometer 30.01*.

"*Nov. 4*, noon position 18.42 N. longitude 83.52 W. course 140, distance 231, *barometer 30.00* partly cloudy moderate breeze and moderate easterly swell.

"*Nov. 5th*, noon position N. longitude 81.22 W. course 143, distance 238, *barometer 29.76*, overcast, fresh breeze and rough northeasterly sea. At 4 PM moderate gale, heavy beam sea, overcast, vessel rolling badly, 4.15 PM reduced speed to 75 r.p.m. account vessel rolling and laboring heavily. 5 PM half speed, eastering hurricane, c/c course to 40, vessel hove to account rolling heavily. 5:15 PM slow speed *barometer 29.-53* 8 PM overcast and squally, fresh gale, heavy sea, vessel laboring heavily, *barometer 29.52.* Midnight, weather overcast and squally wind of gale and storm force, rain squalls, *barometer 29.34.*

"*Nov. 6th,* overcast squally, hurricane, vessel laboring hard. Cargo in shelter deck shifted and breaking up, 8 AM *barometer 28.76* vessel laboring heavily, shipping water all over, overcast and misty, wind hurricane force, squally mountainous seas, vessel hove to, shipping heavy spray over all. Noon lat. 15.47 N. D. R. longitude 80.55 W. D. R. over-

cast and misty, wind hurricane force, continuous rain, chickens all died from exposure. 4 PM *barometer 28.40,* wind hurricane force, high mountainous seas. 4:30 PM engine oil on deck carried away, and smashed, vessel rolling and laboring heavily, shipping spray over all, rain squalls, 9:PM wings, woodwork and side lights on bridge and compass blown away. midnight *barometer 28.42* overcast and misty. wind hurricane force, mountainous seas, vessel rolling and laboring heavily, shipping heavy spray over all.

"*Nov. 7th.* AM superstructure on boat deck blown away, starboard side gangway carried away, deck on starboard side of boat deck torn up badly. 4 AM *barometer 28.44* wind hurricane force, overcast and rainy, vessel laboring and pitching hard. 8 AM vessel still hove to. 9 AM port boat deck superstructure blown away. 9:15 AM windows in main room blown out and mail soaked. Noon, assumed position, latitude 16.56 N. longitude 81.36 W. *barometer 28.61* over cast and misty, winds hurricane force, damaging steam line and tore away port foremast stays, vessel rolling and laboring, taking seas over forward deck, overcast and hazy and mountainous seas. 8 PM *barometer 28.75* vessel laboring heavily and mountainous seas, wind hurricane force. Midnight, vessel rolling and laboring heavily, shipping heavy sprays, overcast, and misty, winds hurricane force and mountainous seas.

"*Nov. 8th.* 4 AM, *barometer 28.54* wind hurricane force, vessel laboring badly shipping heavy spray fore and aft. 8 AM *barometer 28.28* vessel rolling and laboring heavily, shipping heavy spray over all, overcast and misty, hurricane mountainous seas and rain. 8:20 AM engines full speed ahead, course 135, vessel rolling and laboring heavily, shipping heavy spray over all, overcast and misty, hurricane, mountainous seas and rain. Noon, past through center of hurricane, approximate position, lat 16.29, N longitude 80.56 W one half hour calm. 4 PM vessel laboring and taking seas fore and aft, overcast and misty wind hurricane force. 5 PM wind commenced to moderate. 8 PM *barometer 29.40* overcast and cloudy fresh gale and heavy rough seas. Midnite *barometer 29.52,* overcast, moderate fresh gale and heavy rough seas.

"*Nov. 9th.* 4 AM *barometer 29.64,* fresh gale, seas still running high, wind abating, overcast. 8 AM overcast and cloudy, strong breeze, heavy sea, vessel laboring heavily. Noon, latitude 16.39 N longitude 79.30 W. Course various, average speed 6.1 knots,

partly cloudy, moderate southerly breeze and sea.

"*Nov. 10th,* noon, latitude 12.48 N longitude 79.27 W. course 185, distance 235, total distance 1735, average speed 9.8, partly cloudy gentle breeze and small northerly seas.

*Nov. 11th.* 6.17 AM arrived off Colon. 6.23 past jetties, 6.26 AM pilot and doctors on board, 7.23 arrived off wharf. 7.31 vessel secured at dock 9, and finished with the engines."

As further illustrative of conditions, Second Officer Berman says:

"There was a spare anchor securely lashed underneath the forecastlehead, due to the extensive rolling of the vessel cut adrift, mashing deck steam lines, ladder, and mast-stays in its path until it was caught by the crew and lashed to the side of the ship.

"The biggest portion of the bridge was blown away and all the windows in the pilot house were blown out; the porthole of the storeroom where we had some shrimp cases stowed was smashed in due to the heavy seas and there is a shed on either side of the boat deck and over the skipper's quarters which was blown away and the railings on both sides of the boat deck were blown and washed away; the boats were piled up on top of the skylights."

There is other evidence equally as impressive.

(h) The most reasonable conclusion as to the manner libelant's cargo became lost and damaged is (and I so find) that some of the extra equipment, dunnage, or heavy cargo stowed in the bridge deck space with libelant's cargo broke loose from its fastenings, and was thrown against a two-inch water pipe (used for fire protection and sanitary toilets) which ran through such bridge deck space, breaking such pipe and flooding the space with water. The water injured libelant's cargo and set afloat portions of the dunnage and cargo in such space, which also injured libelant's cargo.

(i) Libelant also claims that the pipes in the bridge deck space were not shown to be in good order and repair. The weight of the evidence is (and I find) to the contrary. It is clear, from the evidence, that the pipes would not have burst, and would have probably remained intact, but for the fact that they were broken by something coming loose and striking them.

Libelant also claims negligence upon the part of the master and crew in not sooner discovering the breaking of the pipes and the flooding of the bridge deck space, where libelant's cargo was stowed. One cannot read this record without being impressed as to the very serious situation confronting the master and crew, and I find nothing in the record which convinces me that they were negligent either in this or other respects.

Libelant also claims that the master was inexperienced and inefficient, citing that, while he had experience at sea in other capacities, this was his first voyage as master, and that, after this voyage, he was demoted. The record here shows that the master was either efficient or unusually lucky, and I find that he was efficient, and that he was not negligent.

Libelant also claims that there was negligence on the part of respondents in failing to provide, in good condition, proper scuppers for the draining of water from the bridge deck space. I find no negligence, and that ordinary prudence was used by respondents in that respect.

(j) Libelant says that the evidence here shows that the master and crew were informed of the proximity of the hurricane, both by weather reports and the reading of the barometer on their ship, and that they should have better secured and fastened the spare equipment, cargo, etc., in the bridge deck space, and that, had they done so, the injury and loss to libelant's cargo would not have occurred. They also claim that the master and crew were negligent in not again securing whatever was loose after it became loose, and in not better protecting libelant's cargo after encountering the hurricane. I think the evidence entirely sufficient to show the exercise by the master and crew and by respondents of the diligence required of them in this respect. In fact, I am able to find no acts of negligence upon the part of respondents in connection with this matter.

(k) It is stipulated as follows: "That Libellant took out certificates of insurance Nos. M. P. 25118 and M. P. 25119 under open cargo marine policy No. M.206725 of the Automobile Insurance Company of Hartford, Connecticut on the Two Hundred Ten (210) cases and One Hundred Twenty-five (125) drums of salad oil involved in the above suit; and that said certificates and policy of insurance may be offered in evidence without further proof or identification, subject, however, to such objections of ma-

teriality, competency and relevancy which the claimant may see fit to make to them."

· Such policy (dated early in 1932) and certificates (dated October 31, 1932) were offered in evidence, and, considered and construed together (as I think they must be), show that libelant's cargo was insured, but that there was wording in the contract of insurance providing that libelant's cargo should not be covered unless carried and transported *"under main deck."* Respondents did not know of this requirement in the contract of insurance until after the loss and injury to libelant's cargo had occurred. The insurance rates on cargo on the Velma Lykes stowed in the bridge deck space were the same as on cargo stowed under or below the main deck of such steamship.

■ (1) In 1928 or 1929, a controversy arose between libelant and respondents, with respect to a cargo which respondents then carried for libelant from Houston to Puerto Rico. This was carried, not (as here) in the bridge deck space, but on the open deck, respondents taking out for the benefit of libelant a special policy of insurance thereon. Back in 1929, in the adjustment of that controversy, there was some conversation between libelant's representatives and respondents' representatives with respect to the manner in which libelant's cargo should thereafter be carried. Libelant's representatives recall such conversations to have been that respondents agreed that libelant's cargoes would not be carried above the main deck. Respondents' representatives recall such conversations to have been that libelant's cargoes should not be carried out on the open deck. Respondents assert that there was no agreement such as is claimed by libelant, and testify that for the past several years libelant's cargoes have been, from time to time, carried in the bridge deck space and the other similar space above the main deck. It is clear that there was no meeting of the minds of the parties and agreement that libelant's cargoes should not be carried above the main deck.

■ 1. Libelant claims that respondents agreed in 1929 to thereafter carry libelant's cargoes under and below the main deck, and that such agreement must be read into the bill of lading covering this cargo. As has been pointed out (subparagraph (1) hereof), the evidence shows there was no such agreement. Besides, such a previous agreement may not be received to vary the terms of the bill of lading. The Delaware, 14 Wall. (81 U. S.) 602, 20 L. Ed. 783; Grace v. American Central Ins. Co., 109 U. S. 282, 3 S. Ct. 207, 27 L. Ed. 934; Seitz v. Refrigerating Mach. Co., 141 U. S. 518, 12 S. Ct. 46, 35 L. Ed. 840; Second Nat. Bank v. Columbia Trust Co. (C. C. A.) 288 F. 25, 30 A. L. R. 1299.

■ 2. The bill of lading must therefore be looked to to ascertain the obligations and duties of the parties. It is silent as to the place of stowing libelant's cargo, but contains in paragraph 11 this language: " * * * The carrier shall not be liable as carrier or otherwise, for any loss, damage, delay or default, whether occurring during transit or before, or after, or during, or while awaiting loading, trans-shipment, discharge, delivery or other disposition of the goods, or on board, or in lighters or craft, or on wharf or in warehouse, at any port or place, occasioned by any of the following excepted causes, throughout this contract always excepted. By causes beyond the carrier's reasonable control; by dangers or accidents of the sea or other waters and navigation or transportation of whatsoever nature or kind; by fire or explosion from any cause whatsoever occurring, by barratry, theft or embezzlement of master or crew; by act of God. * * * "

And in paragraph 14 this language: " * * * This shipment is subject to all the terms and provisions of the act of Congress of the United States, approved February 13, 1893, entitled 'An Act Relating to the Navigation of Vessels', etc. and of Sections 4282 to 4287, each inclusive, of the United States Revised Statutes. * * * "

Under the cases, The Delaware, supra; St. Johns N. F. Shipping Corp. v. Companhia Geral, 263 U. S. 123, 44 S. Ct. 30, 68 L. Ed. 202; The St. Johns N. F. (C. C. A.) 272 F. 674; The Gualala (C. C. A.) 178 F. 402; The Southlands, 27 F.(2d) 1010; The Freda (D. C.) 266 F. 552; Davidson v. Flood Bros. (C. C. A.) 30 F.(2d) 280; Walker-Ross v. Dodwell (D. C.) 297 F. 259; Lawrence v. Minturn, 58 U. S. (17 How.) 112, 15 L. Ed. 58. Respondents were obligated to carry libelant's cargo, to use the language found in the opinion in The Delaware, "under deck," and not to do so would amount to a deviation. Respondents, however, press the point that they complied with their obligation by stowing and carrying libelant's cargo in the bridge deck space of the Velma Lykes. This libelant strongly combats, and insists that stowing and carrying such cargo

in the bridge deck space was not "under deck." As has been pointed out, the construction of the sides and top of the bridge deck-space was substantially the same as that of the sides of the ship under and below the main deck, and the openings (doors and hatches) were weather proof and secure. It was shown that such space, and similar space on other vessels, had long been used by respondents for stowing similar cargoes, including those of libelant, without loss or damage to cargo,[2] and that, but for the breaking of the water pipes in the manner described, causing the flooding of such space, the cargo therein would most likely have gone through the hurricane as well, or better, than cargo stowed below the main deck. The evidence shows more or less injury to the cargo under and below the main deck. It is also shown that other steamship lines customarily used bridge deck space, or similar space, for the stowing of cargo. Also that stowing of cargo in such space was generally, and in this instance, approved by insurance underwriters.

The facts in The Delaware, supra, were that the cargo (76 tons of pig iron) was stowed on the open deck. In Lawrence v. Minturn, supra, the cargo (two steam boilers and chimneys) was likewise stowed on the open deck. This is likewise true in Davidson v. Flood Bros., supra; The Freda, supra; The Southlands, supra; and The Gualala, supra.

In The Kirkhill (C. C. A.) 99 F. 575, 576, relied upon by libelant, the space in which the cargo was loaded was referred to as the "alleyway spaces on deck." The description of this space appears in the note.[3] The inclosure of the cargo was stated to be temporary, and that it could not be permanently closed in, made watertight, nor fully covered. Here the space in which libelant's cargo was stowed was fully inclosed, had secure doors and protected hatches, and, even in the hurricane which the Velma Lykes went through, no sea water entered such space; the water in the space being, as stated, from the breaking of the pipes.

In The Sarnia (C. C. A.) 278 F. 460, the cargo was two automobiles and a case of advertising matter, which were stowed on the open deck, and not in an inclosed space as here.

In St. Johns Corp. v. Companhia, supra, the cargo was 800 barrels of rosin which was stowed on the open deck, "boxed down and planked," and which, before arrival at port, broke adrift in a hurricane, etc.

In Williams v. Mora, Fed. Cas. No. 17,-730, the cargo of sugar and molasses was stowed in the poop deck space. This space is described in the note.[4] It is quite similar to the bridge deck space under consideration

---

[2] The controversy between libelant and respondents in 1928 and 1929 (subparagraph (1), arose over a cargo of libelant's stowed by respondents on the *open* deck and not in the bridge deck space.

[3] "The record does not contain a precise description of the steamship Kirkhill, but the alleyways spaces were described in the argument before us by the proctor for appellee, and the description was accepted as substantially correct, and is about as follows: For a distance amidships, and extending from side to side, is an upper deck house which supports the officers' bridge. There are gaps in this deck erection forward and aft of the bridge, where the main deck is left quite open. The covering over the midship part of such deck space is for the protection of the engine room and the quarters for the men, with fore and aft passages on each side leading out. These are the alleyways. At the front end of such a passage or alleyway is a door of wood or iron opening out upon the open main deck, and, when cotton is stowed there, bales are placed as close as possible in the outboard side of such passage, so as to leave a narrow gangway alongside the cotton for the passage of the crew and engineers. Such spaces are covered over, but cannot be permanently closed in, as the doors at the end have to be opened by the crew in passing in and out. They cannot be made watertight, because they cannot be covered, as are the hatches, by tarpaulin covers, which prevent possibility of leakage. These vertical doors at the front of the alleyways have to stand the full impact of the seas which may sweep over the deck."

[4] "Whether the goods were shipped on or under deck depended upon the question whether or not the poop deck upon the vessel, under which a portion of the cargo was stored, afforded a compliance with the bill of lading. The bark Abeona was originally a single-decked vessel. Subsequently a poop deck was built across her from near the after hatch back, a length of some forty feet; and as it respects the stowage, the principal objection was that some of the hogsheads of sugar and concentrated molasses were stowed upon their heads.

here, and stowing there was held not to be a deviation.

In The William Crane (D. C.) 50 F. 444, the facts are quite similar to the case here. The description of the space in which the cargo of cotton was stowed is shown in the note.[5] It is said that the question is not whether the cotton was carried under the main deck, but whether it was carried in a protected place under cover and where experience had demonstrated it would be safe. It was held not to be a deviation.

In Lagerloef Trading Company v. United States (D. C.) 43 F.(2d) 871, 872, the cargo (matches) was stowed in the lazaret, which upon the ship's plan was designated, not for stowing of cargo, but for ship's stores. The description of the lazaret is contained in the note.[6] It was held that such stowage in the lazaret would not be regarded as a deviation.

In The Neptune, Fed Cas. No. 10,118, the cargo was casks of oil. The place where it was carried is described in the note.[7] The

---

"We have looked carefully into the evidence in the case, which is very contradictory and conflicting upon the questions as to the condition and sufficiency of the poop deck, and have arrived at the conclusion that the fair weight of it supports the position of the libelants that the stowing of the goods under it satisfied the bill of lading requiring them to be shipped under deck. The question is not whether this deck was built when the ship was originally constructed, but whether it afforded security and protection to the goods within the meaning of the bill of lading, as under deck; and, upon the evidence, we are bound to say it did. The conflict of testimony in the case shows a very unsettled and unreliable state of opinion among the most intelligent persons engaged in the shipping business of this port, upon a question with which they ought to have been familiar. The endurance of this deck, in the several voyages the bark has performed since it was built, strengthens very much the testimony of the witnesses who have maintained its sufficiency to protect the cargo, the same as under deck. In respect to the stowage of the hogsheads on the head, the evidence is full in support of the usage."

[5] "This is a libel to recover for damage by sea water to 80 bales of cotton shipped on the steamer William Crane, to be carried from Savannah to Baltimore. The decision of this case depends upon whether the cotton was stowed in a place on the steamer where, under the bill of lading, it might rightly be placed. The William Crane is a large iron steam propeller, intended for the coastwise trade, and above her main deck has an upper deck, on the top of which are structures containing pilot house, officers' quarters, and staterooms for passengers. Along the sides of the ship this upper deck is not altogether permanently inclosed, but may be inclosed when required for carrying cargo. The space between the main and upper decks is seven feet in height. Four feet of this height is permanently defended by the iron bulwarks and rail of the ship, and the re-

maining three feet between the rail and the upper deck has wooden shutters, which can be tightly fitted in, and made fast between the permanent uprights which support the upper deck, thus inclosing the entire space. The middle of the ship between the main and the upper deck is occupied by permanent structures containing the engine room and quarters for the engineers and others, leaving an alleyway on each side. The forward end of each alleyway is closed by a heavy bulkhead with doors. It was in these alleyways that the cotton involved in this controversy was stowed. It was raised somewhat from the deck by dunnage, and was kept in place by uprights, which left a narrow gangway alongside the engine room house."

[6] "The matches were stowed in the lazaret over the after peak tank, which upon the ship's capacity plan posted on the Bird City was not designated for the stowage of cargo, but for ship's stores. However, the testimony is that both before and after this voyage this space had, on occasions, been used for the stowage of cargo, and such stowage had been approved by the New York Board of Underwriters. The testimony of an experienced marine surveyor is that the pintle on which the rudder moves was riveted to the after end of the lazaret with a large number of rivets, and that this, with the curved plates rounding out the contour of the stern, tended to produce a certain amount of leakage, and to cause the lazaret to be damp and wet. This seems probable, and I accept it as true. It also appears that subsequently the bulkhead between the lazaret and the hold was removed, and, for the purpose of providing better drainage for this space, two scuppers were added. On the voyage, the Bird City met some heavy seas, and, although she carried a full cargo, the only damage to cargo by sea water was that sustained by this particular shipment in the lazaret."

[7] "As appears from the proofs, a large portion of the hold of such a propeller as this one was, is used for her engines, water, boilers, coal, etc., although there is

facts there are quite similar to the facts here, in that the stowage was between decks, i. e., a covered space between the main deck and an upper deck, and it was held not to be a deviation.

I think respondents fully complied with their obligation in stowing libelant's cargo in the bridge deck space, and that stowing there did not amount to a deviation.

3. Other deviation claimed is not shown nor supported by the evidence. Nor does the evidence show other acts of negligence upon the part of respondents. And this is true notwithstanding presumptions that may be indulged because of the failure of respondents to produce the master. I think the almost unprecedented hurricane which the Velma Lykes passed through was the sole and only cause of the loss and damage to libelant's cargo, and that under the provisions of the bill of lading and the law applicable, respondents are not liable. Section 192, title 46, USCA; The Warren Adams (C. C. A.) 74 F. 414; Id., 163 U. S. 679, 16 S. Ct. 1199, 41 L. Ed. 316; The Giulia (C. C. A.) 218 F. 746; The Rosalia (C. C. A.) 264 F. 288; The Folminia, 212 U. S. 361, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Frey (C. C. A.) 106 F. 320; The Josephine (C. C. A.) 49 F.(2d) 207.

4. Libelant claims that, because its insurance policy required stowage "under main deck," respondents are liable for the loss and damage to libelant's cargo. The evidence shows beyond question that respondents had no notice nor knowledge of this requirement of libelant's policy of insurance. If I be correct in the above conclusion that respondents were within their rights in stowing libelant's cargo in the bridge deck space, and that they are not liable to libelant, I think no liability can arise by reason of libelant relying upon a policy of insurance so limited in its scope and about which respondents knew nothing.

Decree for respondents.

some space left for freight; but much the greater part of the freight is carried between decks, or on the main deck, as it is called. This deck is constructed specially for the purpose of carrying freight. It is bulwarked entirely around, and covered by the upper deck, and is as completely protected from the weather and from storms, as if it were the hold; and freight can be stowed in it as securely as in the hold. It may, perhaps require more care in the stowage of casks, and of packages of that description, to prevent their rolling in stormy weather, than if they were in the hold, the tendency to disturb the cargo upon this deck being greater than when it is below. I concur, therefore, with the court below, that no fault is chargeable to the vessel, in stowing the oil in the between decks."